[L.A. No. 31533. Aug. 23, 1982.]

LAWRENCE L. BAGGETT et al., Plaintiffs and Appellants, v.
DARYL GATES, as Chief of Police, etc., et al., Defendants and
Appellants.

DAVID B. ZELHART, Plaintiff and Appellant, v.
DARYL GATES, as Chief of Police, etc., et al., Defendants and
Appellants.

**COUNSEL**

Cecil W. Marr, Robert J. Loew and Loew & Marr for Plaintiffs and Appellants.

William H. Sortor, David P. Clisham and Carroll, Burdick & McDonough as Amici Curiae on behalf of Plaintiffs and Appellants.

Ira Reiner and Burt Pines, City Attorneys, Frederick N. Merkin, Senior Assistant City Attorney, and Catharine H. Vale, Assistant City Attorney, for Defendants and Appellants.

Burke, Williams & Sorensen, Royal M. Sorensen and Virginia R. Pesola as Amici Curiae on behalf of Defendants and Appellants.

OPINION

**BIRD, C. J.**—The primary issue presented by this case is whether the Public Safety Officers' Procedural Bill of Rights Act (Bill of Rights Act) applies to chartered cities. (See Gov. Code, §§ 3300-3311.)

I.

Plaintiffs, Lawrence Baggett, David Butler, John Spencer and David Zelhart, are police officers employed by the Los Angeles Police Department (Department). Defendants are the chief of police, the board of police commissioners and the City of Los Angeles.

Under the Department's salary structure, known as the Jacobs Plan, each of the several civil service job classes—i.e., police officer, sergeant, lieutenant, captain and deputy chief—may have more than one "paygrade" or salary level. (L.A. Admin. Code, § 4.140(n).) Officers "appointed . . . to a class having more than one pay grade may be assigned and reassigned within that class" in accord with the regulations promulgated by the board of police commissioners. (*Ibid.*) These regulations are set forth in the Los Angeles Police Department Manual (Department Manual).

The paygrades within the civil service class of police officer, the class held by plaintiffs here, are police officers I, II, and III. (See L.A. Admin. Code, § 4.140(n).) Police officer I is the entry-level paygrade. Police officer II applies to officers who have completed one and one-half years of service. Police officer III applies to officers assigned to certain specialized positions involving increased responsibilities or calling for special qualifications. Such assignments are called "advanced paygrade assignments" and are compensated at higher rates. (See generally, 3 Department Manual, § 763 et seq.)

The Jacobs Plan also provides for additional compensation, over and above that attached to class and paygrade, for those officers assigned to positions involving particularly hazardous duties. (L.A. Admin. Code, § 4.159(g)(2), pt. B.)

Until July 1979, plaintiffs worked in the firearms and explosives unit of the Department's scientific investigation division. All four of them had been assigned to the unit for a number of years and had acquired extensive, specialized training and experience in the handling of fire-

arms and explosives. Since positions in this unit are classified as "advanced paygrade assignments" and as particularly hazardous, plaintiffs received extra compensation for both. That is, they were compensated at the rate of a "Police Officer III + 3." The extra salary received totaled approximately $5,000 per year.

In July 1979, the Department received information that plaintiffs and several others had engaged in misconduct during work hours. The alleged misconduct included: drinking while on duty or while on police premises; shooting pellet and/or BB rifles inside police premises and into the streets; mishandling evidence, including explosives; and various "pranks." Shortly thereafter, the Department's internal affairs division began an investigation.

Early in the course of the investigation, each plaintiff was interrogated at some length. The Department told plaintiffs of the nature of the investigation prior to questioning them. They were also warned that it could lead to formal charges of misconduct.[1]

Each officer was asked to consent to a search of his home. Baggett and Butler did so, but only Baggett's home was searched. Spencer and Zelhart refused to give their consent. The Department searched plaintiffs' personal desks on July 11, 1979. No effort was made to obtain plaintiffs' consent to these searches.

On July 12, 1979, the commanding officer of the scientific investigation division, Captain Brennan, placed Officers Baggett, Spencer and Zelhart on temporary loan to other divisions within the Department. Officer Butler was placed on temporary loan outside the division when he returned from vacation on August 2, 1979. While on temporary loan, plaintiffs received the same salary as before.

The investigation failed to substantiate some of the alleged acts of misconduct and revealed that the remaining acts had occurred over a

---

[1]Officers Spencer, Baggett, and Zelhart were questioned at the Department on July 11, 1979, for periods ranging from four to eleven hours. Baggett and Zelhart's interrogation did not end until several hours after their watch was over. Spencer's interrogation took place during the evening hours after his watch.

Although he was on vacation, Officer Butler was questioned at home on July 13, 1979. He had been asked to come to the Department but was unable to do so due to the illness of a family member. The interrogation ended after only a few hours due to the death of the family member.

year earlier. As a result, no formal charges were brought against plaintiffs.[2] However, under the Department's regulations, "An officer below the rank of lieutenant in an advanced paygrade position may be reassigned to a lower paygrade position within his classification when ... [such] officer clearly demonstrates his failure or inability to satisfactorily perform the duties of the position." (3 Department Manual, § 763.55.)[3] Based on the investigation, Captain Brennan concluded that plaintiffs' performance had been negligent and unsatisfactory. Accordingly, in December 1979, he formally recommended that plaintiffs be reassigned to lower-paying police officer II positions outside the firearms and explosives unit.

The Department approved Brennan's recommendation and notified plaintiffs that they would be reassigned to police officer II positions in January and February of 1980.[4] Their request for a hearing or administrative appeal was denied. Departmental regulations provide for a hearing only when a formal personnel complaint is also filed against an officer. (See 3 Department Manual, § 763.60; see also L.A. City Charter, § 202.)

Seeking to prevent their reassignment, plaintiffs filed a petition for writ of mandate and complaint for declaratory and injunctive relief in Los Angeles Superior Court.[5] Relying primarily on the Bill of Rights Act (Gov. Code, §§ 3300-3311),[6] plaintiffs contended that defendants could not reassign them to lower paying positions without affording

---

[2]Section 202, subdivision (1), of the Los Angeles City Charter provides, in pertinent part, that "charges [against an officer] must be based upon some act committed or omitted by such officer ... within one (1) year prior to the filing of [a] complaint" against him or her.

[3]Section 763.55 provides that "An officer below the rank of lieutenant in an advanced paygrade position may be reassigned to a lower paygrade position within his classification when one of the following conditions exists:

"An officer requests reassignment, OR

"An officer completes a fixed tour of duty in a position, OR

"A position is eliminated, OR

"When an officer clearly demonstrates his failure or inability to satisfactorily perform the duties of the position."

[4]Under the Department's regulations, although the commanding officer may temporarily reassign an officer to a lower paygrade position, as was done here, the officer's compensation is not reduced until a formal recommendation is forwarded to and approved by the director of the office of administrative services. (3 Department Manual, § 763.60.)

[5]Officers Baggett, Spencer and Butler filed their action in December 1979. Officer Zelhart filed his in February 1980. The trial court ordered the actions consolidated since they raised identical issues. (See Code Civ. Proc., § 1048.)

[6]All statutory references are to the Government Code unless otherwise indicated.

them an administrative appeal as provided in section 3304, subdivision (b) of the act.[7]

In their answer, defendants asserted that the act could not constitutionally be applied to a charter city such as Los Angeles. Defendants further asserted that plaintiffs had no right to an administrative appeal under the act. According to defendants, the transfer or downgrading of plaintiffs did not constitute "punitive action" since it was not undertaken "for purposes of punishment."

After the hearing, the trial court granted plaintiffs the relief they requested. The court's judgment and order, entered July 23, 1980, directed issuance of a peremptory writ of mandate ordering defendants (1) to give plaintiffs an administrative appeal before taking any action which would reduce their salary and (2) to otherwise comply fully with the provisions of the Bill of Rights Act. In addition, the court permanently enjoined defendants "from transferring or reassigning any officer(s) from advanced paygrade assignments to duties at lower paygrades until such officer(s) have been afforded an opportunity for an administrative appeal." Subsequently, the court denied plaintiffs' motion for attorney fees.

Defendants appealed. Although agreeing that the act applies to charter cities, the Court of Appeal held that the right to an administrative appeal provided by section 3304, subdivision (b) arises only when an officer is reassigned to a lower paygrade assignment "solely or substantially for purposes of punishment."

Plaintiffs also appealed from the trial court's denial of their motion to recover attorney fees under section 1021.5 of the Code of Civil Procedure.

This court granted hearing to consider the case in connection with *White* v. *County of Sacramento* (1982) 31 Cal.3d 676 [183 Cal.Rptr. 520, 646 P.2d 191].

---

[7]Section 3304, subdivision (b) provides: "No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency without providing the public safety officer with an opportunity for administrative appeal."

The term "punitive action" is defined in section 3303 as "any action which may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment."

## II.

■ The first issue this court must decide is whether application of the Bill of Rights Act to charter cities violates the home rule provisions of the California Constitution. (Cal. Const., art. XI, § 5.)

As its title suggests, the act sets forth a list of basic rights and protections which must be afforded all peace officers (see § 3301) by the public entities which employ them. It is a catalogue of the minimum rights (§ 3310) the Legislature deems necessary to secure stable employer-employee relations (§ 3301).

In brief, the act (1) secures to officers the right to engage in political activity, if they so desire, when off-duty and out of uniform, "[e]xcept as otherwise provided by law" (§ 3302); (2) prescribes certain protections that must be afforded officers during interrogations which could lead to punitive action against them (§ 3303);[8] (3) gives officers the right to review and respond in writing to adverse comments entered in their personnel files (§§ 3305, 3306); (4) allows officers to refuse to submit to a lie-detector test (§ 3307); (5) prohibits searches of officers' personal storage spaces or lockers except when they are present, or have been notified, or give their consent, or a valid warrant is obtained (§ 3309); (6) limits the circumstances in which officers may be compelled to disclose their personal financial status (§ 3308); (7) gives officers the right to an administrative appeal when any punitive action is taken against them, or they are denied promotion on grounds other than merit (§ 3304); and (8) protects officers from retaliation for the exercise of their rights under the act (*ibid.*).

The general home rule provision of the Constitution gives chartered cities the power to "make and enforce all ordinances and regulations in

---

[8]For example, before being interrogated an officer must be told of the nature of the investigation (§ 3303, subd. (c)), the name of the officer in command, and the names of the interrogating officers (§ 3303, subd. (b)). Both the agency and the officer have the right to record interrogation sessions. (§ 3303, subd. (f).)

Unless the seriousness of the investigation requires otherwise, interrogations must be conducted at a reasonable hour (§ 3303, subd. (a)) and for a reasonable time (§ 3303, subd. (d)). There must be no browbeating, or threat of punitive action, or promise of reward used to induce an officer to answer questions. (§ 3303, subd. (e).) An officer may, however, be told that his or her failure to answer may result in punitive action. (*Ibid.*)

An officer has a right to be represented by a person of his choice when it appears likely that punitive action may be taken against him. (§ 3303, subd. (h).) If it appears that an officer may be charged with a criminal offense, he must be informed of his constitutional rights. (§ 3303, subd. (g).)

respect to municipal affairs, subject only to [the] restrictions and limitations provided in their several charters ...." (Cal. Const., art. XI, § 5, subd. (a).)[9] Further, charter provisions, ordinances or regulations "relating to matters which are purely 'municipal affairs'" prevail over state laws covering the same subject. (*Baron* v. *City of Los Angeles* (1970) 2 Cal.3d 535, 539 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R. 3d 1036]; Cal. Const., art. XI, § 5, subd. (a).)

"As to matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters ...." (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 61 [81 Cal.Rptr. 465, 460 P.2d 137].) Accordingly, the applicability of the Bill of Rights Act to charter cities turns on whether the matters it addresses are of statewide concern or are "strictly" a municipal affair. (*Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 315-316 [152 Cal.Rptr. 903, 591 P.2d 1] [*Sonoma County*].)

Although what constitutes a matter of statewide concern is ultimately an issue for the courts to decide,[10] it is well settled that this court will accord "great weight" to the Legislature's evaluation of this question. (*Bishop* v. *City of San Jose, supra*, 1 Cal.3d at p. 63.) Therefore, it is significant that the Legislature has expressly declared that "the rights and protections provided to peace officers [by the Bill of Rights Act] constitute a matter of statewide concern." (§ 3301.)

Moreover, this is not the usual case in which the Legislature has left the courts to divine why this is so. (See, e.g., *Sonoma County, supra*, 23 Cal.3d at p. 316 and fn. 20.) Instead, the Legislature has set forth the findings underlying its conclusion: "[E]ffective law enforcement depends upon the maintenance of stable employer-employee relations, be-

---

[9]The cited text reads: "(a) It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

[10]"'Because the various sections of article XI fail to define municipal affairs, it becomes necessary for the courts to decide, under the facts of each case, whether the subject matter under discussion is of municipal or statewide concern.'" (*Bishop* v. *City of San Jose, supra*, 1 Cal.3d at p. 62, quoting from *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 294 [32 Cal.Rptr. 830, 384 P.2d 158].)

tween public safety employees and their employers. In order to assure that such stable relations are continued throughout the state and to further assure that effective services are provided to all people of the state, it is necessary that this chapter be applicable to all public safety officers ... wherever situated within the State of California." (§ 3301.)

Defendants, however, argue vigorously that the Bill of Rights Act is nothing more than an attempt by the Legislature to impose rigid rules regarding the internal affairs of city police departments. That this is a province the Legislature cannot invade is established, they contend, by section 5, subdivision (b) of article XI. That subdivision provides in pertinent part: "It shall be competent in all city charters to provide ... for: (1) the constitution, regulation, and government of the city police force ...." Moreover, cities are granted "plenary authority" to provide in their charters for the "compensation, method of appointment, qualifications, tenure of office and removal" of their employees. (Cal. Const., art. XI, § 5, subd. (b)(4).)[11]

Superficially, these provisions raise some doubt as to whether the Bill of Rights Act may be applied to charter cities. On closer scrutiny, however, it becomes clear that it may. In the first place, the act impinges only minimally on the specific directives of section 5, subdivision (b). Review of the act's provisions (see *ante*, at p. 135) demonstrates that the act does not interfere with the setting of peace officers' compensation.[12] (Compare *Sonoma County, supra*, 23 Cal.3d at pp. 316-318 [invalidating legislative attempt to impose a pay freeze on municipal employees]; see also *San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 790-791 [163 Cal.Rptr. 460, 608 P.2d 277] [invalidating legislative attempt to impose

---

[11]The cited text reads: "(b) It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."

[12]The only place compensation is mentioned is in section 3303, subdivision (a) which provides: "If [the] interrogation [of a public safety officer] ... occur[s] during off-duty time ... the public safety officer shall be compensated for such off-duty time in accordance with regular department procedures ...."

a prevailing wage requirement].) Nor does the act purport to regulate their qualifications for employment (compare *Ector* v. *City of Torrance* (1973) 10 Cal.3d 129, 132-133 [109 Cal.Rptr. 849, 514 P.2d 433] [invalidating legislative attempt to prohibit charter cities from imposing residency requirements]), nor "the manner in which," or "the method by which," or "the times at which," or "the terms for which" peace officers "shall be elected or appointed." (Cal. Const., art. XI, § 5, subd. (b)(4).) Similarly, it does not affect their tenure of office or purport to regulate or specify the causes for which they may be removed. (Compare *Pearson* v. *County of Los Angeles* (1957) 49 Cal.2d 523, 533, 536 [319 P.2d 624] [holding state statute providing for removal of peace officers convicted of a felony inapplicable to a charter county].)

The act does, however, impinge on the city's implied power to determine the manner in which its employees may be removed. Although the act in no way interferes with the city's exclusive jurisdiction over removal of its employees (compare *Curphey* v. *Superior Court* (1959) 169 Cal.App.2d 261, 268 [337 P.2d 169] [holding state statute providing for removal of employees by action of a grand jury inapplicable to a charter county]), it does require the city to provide peace officers "an opportunity for administrative appeal." (§ 3304, subd. (b).)[13] And, of course, it cannot be gainsaid that other provisions impinge to a limited extent on the city's general regulatory power over the department.

However, in *Professional Fire Fighters Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d 276, this court specifically rejected the notion that any intrusion upon matters connected with public employment is necessarily an intrusion upon "municipal affairs." (*Id.,* at p. 291.) *Professional Fire Fighters* involved the right of Los Angeles firemen to join a labor union. Relying on the home rule provisions of the Constitution, the city there contended that the statutes purporting to confer this right on its fire department employees unlawfully interfered with its exclusive and

---

[13]Of course, to the extent this right is coextensive with the requirements of due process, it cannot be said to impinge upon the city's powers.

It should be noted that a number of the act's provisions have a constitutional basis, including: (1) the right to engage in political activity provided by section 3302 (see, e.g., *Kinnear* v. *San Francisco* (1964) 61 Cal.2d 341 [38 Cal.Rptr. 631, 392 P.2d 391]); and (2) the limitations on financial disclosures provided by section 3308 (see, e.g., *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]).

plenary authority over all matters bearing on its relation with its public employees. (*Id.*, at pp. 280, 291; see Cal. Const., art. XI, § 5, subd. (b)(4).)[14]

In rejecting the city's contention, this court observed that general laws seeking to accomplish an objective of statewide concern may prevail over conflicting local regulations even if they impinge to a limited extent upon some phase of local control. (*Professional Fire Fighters, supra*, 60 Cal.2d at pp. 292, 295.) Accordingly, this court held that the state statutes which gave firemen the right to join a labor union were applicable to charter cities. "The total effect of all this legislation was not to deprive local government (chartered city or otherwise) of the right to manage and control its fire departments but to create uniform fair labor practices throughout the state. As such, the legislation may impinge upon local control to a limited extent, but it is nonetheless a matter of state concern." (*Id.*, at pp. 294-295.)

Of course, the matter is no different when it comes to the police departments of chartered cities. General laws seeking to assure fair labor practices may be applied to police departments, just as they may be applied to fire departments, even though they impinge upon local control to a limited extent. (*Huntington Beach Police Officers' Assn. v. City of Huntington Beach* (1976) 58 Cal.App.3d 492, 500-502 [129 Cal.Rptr. 893]; see also *Los Angeles County Civil Service Com. v. Superior Court* (1978) 23 Cal.3d 55, 65-66 and fn. 12 [151 Cal.Rptr. 547, 588 P.2d 249].)[15]

Finally, it can hardly be disputed that the maintenance of stable employment relations between police officers and their employers is a

[14]The home rule provisions of the Constitution were revised in 1970. The provisions in effect at the time *Professional Fire Fighters* was decided were set forth in former article XI, sections 6, 8 and 8 1/2.

As relevant here, the 1970 revision effected no substantive change in these provisions. Article XI, section 13 declares, "The provisions of Section[] ... 5 of this article relating to matters affecting the distribution of powers between the Legislature and cities ... shall be construed as a restatement of all related provisions of the Constitution in effect immediately prior to the effective date of this amendment [June 2, 1970], and as making no substantive change."

[15]It has long been recognized that the home rule provisions of the Constitution do not place the police departments of charter cities beyond the reach of state laws addressing matters of statewide concern, even where such laws intrude upon local regulation. (E.g., *Healy v. Industrial Acc. Com.* (1953) 41 Cal.2d 118, 121-122 [258 P.2d 1]; *Long Beach Police Officers Assn. v. City of Long Beach* (1976) 61 Cal.App.3d 364, 371 [132 Cal.Rptr. 348]; *Lossman v. City of Stockton* (1935) 6 Cal.App.2d 324, 332-333 [44 P.2d 397].)

matter of statewide concern. The consequences of a breakdown in such relations are not confined to a city's borders. These employees provide an essential service. Its absence would create a clear and present threat not only to the health, safety and welfare of the citizens of the city, but also to the hundreds, if not thousands, of nonresidents who daily visit there. Its effect would also be felt by the many nonresident owners of property and businesses located within the city's borders. Our society is no longer a collection of insular local communities. Communities today are highly interdependent. The inevitable result is that labor unrest and strikes produce consequences which extend far beyond local boundaries.

Moreover, there is a direct, substantial connection between the rights provided by the Bill of Rights Act and the Legislature's asserted purpose. To give but one example, the administrative appeal provided is akin to a grievance system. It allows an officer who believes that his conduct or performance does not warrant punitive action an opportunity to present his side of the matter. Grievance systems have proved to be highly successful devices for helping to maintain labor peace. (Final Rep. Assem. Advisory Council on Public Employee Relations (Mar. 1973) at p. 186.)

In sum, here, as in *Professional Fire Fighters*, the total effect of this legislation is not to deprive local governments of the right to manage and control their police departments but to secure basic rights and protections to a segment of public employees who were thought unable to secure them for themselves.

"[T]he constitutional concept of municipal affairs is not a fixed or static quantity. It changes with the changing conditions upon which it is to operate." (*Pac. Tel. & Tel. Co.* v. *City & County of S. F.* (1959) 51 Cal.2d 766, 771 [336 P.2d 514].) There must always be doubt whether a matter which is of concern to both municipalities and the state is of sufficient statewide concern to justify a new legislative intrusion into an area traditionally regarded as "strictly a municipal affair." Such doubt, however, "must be resolved in favor of the legislative authority of the state." (*Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 681 [3 Cal.Rptr. 158, 349 P.2d 974], citations omitted.)

For these reasons, this court holds that the Bill of Rights Act may constitutionally be applied to charter cities.

### III.

The next issue this court must decide is whether the right to an administrative appeal provided by the Bill of Rights Act extends to peace officers who, like plaintiffs, are reassigned to lower paying positions.

Section 3304, subdivision (b) of the act provides, "No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency without providing the public safety officer with an opportunity for administrative appeal." The term "punitive action" is defined in section 3303 as "any action which may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment."

Plaintiffs assert that their reassignments will result in a loss in pay and are, therefore, punitive actions giving rise to a right of appeal under sections 3303 and 3304. Defendants, however, contend that the phrase "for purposes of punishment" qualifies each of the preceding terms in section 3303. Therefore, they argue that "reductions in salary" which are not imposed "for purposes of punishment" are excluded from the reach of the statute. Since defendants argue that plaintiffs' reassignments were not imposed for purposes of punishment, they contend that plaintiffs are not entitled to a hearing under section 3304.

For the reasons set forth in *White* v. *County of Sacramento, supra,* 31 Cal.3d 676, at pages 679-684, this court has concluded that the phrase "for purposes of punishment" qualifies only the term "transfer." "[A] decision to reassign a peace officer to a lower paying position is per se disciplinary, or punitive in nature . . . ." (*Id.,* at pp. 683-684.) Accordingly, under section 3304 an officer subject to such action must be accorded the opportunity for an administrative appeal. (*Ibid.*) It follows that plaintiffs here are entitled to an administrative appeal.

Moreover, "looking through form to substance," it is evident that plaintiffs' reassignments came about because of their alleged improper prior conduct. (*Heyenga* v. *City of San Diego* (1979) 94 Cal.App.3d 756, 759 [156 Cal.Rptr. 496].) The record before this court compels the conclusion that plaintiffs were reassigned "for purposes of punishment."

## IV.

As to plaintiffs' appeal, the only question to be decided is whether the trial court abused its discretion in denying their motion for attorney fees under section 1021.5 of the Code of Civil Procedure.[16]

Section 1021.5 provides for court-awarded attorney fees under a private attorney general theory. (See also *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303].) As this court explained in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200], the private attorney general doctrine "rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions .... [W]ithout some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. [Citations.]"

The decision as to whether an award of attorney fees is warranted rests initially with the trial court. (*Id.*, at pp. 938, 940-941, 942.) "[U]tilizing its traditional equitable discretion," that court "must realistically assess the litigation and determine, from a practical perspective" (*id.*, at p. 938) whether or not the statutory criteria have been met. In this case, the trial court had to evaluate whether plaintiffs' action: (1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter. (See Code Civ. Proc., § 1021.5; *Woodland Hills, supra*, at pp. 935-942.)[17]

Where, as here, a trial court has discretionary power to decide an issue, its decision will be reversed only if there has been a prejudicial

[16]Section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

[17]Since plaintiffs' action did not produce any monetary recovery, factor "(c)" of Code of Civil Procedure section 1021.5 is not applicable. In addition, no one contested the need for private, as compared with public, enforcement in this case, which is one of the criteria under factor "(b)." (See *ante*, fn. 16.)

abuse of discretion. "'To be entitled to relief on appeal ... it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice....'" (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 242, p. 4234, citations omitted.) However, "discretion may not be exercised whimsically and, accordingly, reversal is appropriate 'where no reasonable basis for the action is shown.' [Citation.]" (*Marini* v. *Municipal Court* (1979) 99 Cal. App.3d 829, 835-837 [160 Cal.Rptr. 465]; see generally, 6 Witkin, Cal. Procedure, *supra*, § 244, pp. 4235-4236.)

Analysis of plaintiffs' action leads to the conclusion that there was no reasonable basis for the trial court's denial of their motion for attorney fees. Plaintiffs' action resulted in securing for themselves and many others the basic rights and protections of the Bill of Rights Act. This court has today concluded that these rights and protections are matters of statewide concern. It follows that the rights vindicated by plaintiffs are sufficiently "important" to justify an attorney fee award. (See *Woodland Hills, supra*, 23 Cal.3d at p. 936.)

Moreover, it can scarcely be contended that plaintiffs' litigation has not conferred a "significant benefit" on the "general public." Since enforcement of the Bill of Rights Act should help to maintain stable relations between peace officers and their employers and thus to assure effective law enforcement, plaintiffs' action directly inures to the benefit of the citizenry of this state. (See *ante*, at pp. 139-140.) No one can be heard to protest that effective law enforcement is not a "significant benefit."

Finally, although this is a closer question, the record before this court indicates that the financial burden this suit placed on plaintiffs was out of proportion to their personal stake in the case. By their action, plaintiffs have secured the enforcement of basic procedural rights, including the right to an administrative appeal of disciplinary actions. However, enforcement of these procedural rights may well not result in any pecuniary benefit to plaintiffs themselves. (See *Serrano* v. *Priest, supra*, 20 Cal.3d 25, 45.) For example, plaintiffs' newly won right to an administrative appeal of the Department's decision to reassign them to lower paying positions will not necessarily result in the reversal of that decision. Plaintiffs' reassignment and consequent reduction in salary may be approved.

This court is satisfied that plaintiffs' action meets the requirements of section 1021.5 of the Code of Civil Procedure. Therefore, plaintiffs are entitled to recover their attorney fees.

# V.

Since no reasonable basis for denying plaintiffs' motion for attorney fees appears in the record, the trial court's refusal to award fees was an abuse of discretion and its denial order must be reversed. In all other respects, the judgment is affirmed. The case is remanded for further proceedings consistent with this opinion. Plaintiffs-appellants shall recover their costs on appeal.

Mosk, J., Newman, J., Broussard, J., and Reynoso, J., concurred.

**KAUS, J.,** Concurring and Dissenting.—I concur in parts II and III of the court's opinion, but dissent from the court's conclusion in part IV that the trial court abused its discretion in denying plaintiffs' motion for attorney fees under Code of Civil Procedure section 1021.5. On the facts of this case, I believe the trial court could very reasonably conclude that a "private attorney general" attorney fee award was not warranted because the financial burden of the lawsuit did not transcend plaintiffs' personal interest in the litigation.

In establishing the parameters of this state's private attorney general doctrine, section 1021.5 provides that a trial court may award attorneys fees against a losing party in an action resulting in the enforcement of an important right if, inter alia, "the necessity and financial burden of private enforcement are such as to make the award appropriate." In analyzing this requirement in *Woodland Hills Resident Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 941-942 [154 Cal.Rptr. 503, 593 P.2d 200], we explained that this limitation was intended to reserve a private attorney general fee award for those cases in which such an award is needed to effectuate an important public policy, i.e., those cases in which a private plaintiff's personal interest alone is insufficient to make it likely that he would have incurred the attorney fees to bring the action. Quoting from the Court of Appeal decision in *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal. Rptr. 71], we held: "'An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter."'" (23 Cal.3d at p. 941; see also *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 45-46 & fn. 18 [141 Cal.Rptr. 315, 569 P.2d 1303].)

On the facts of this case, the trial court could well have determined that a statutory fee award was not needed as an incentive to insure that plaintiff's statutory rights would be vindicated and that the cost of the lawsuit did not place a burden on plaintiffs "out of proportion to [their] individual stake in the matter."

The attorney fees at issue total about $8,400. As the court's opinion notes, each of the four plaintiffs is challenging the validity of a disciplinary sanction which threatens to reduce his salary by $5,000 a year. Although there is, of course, no guarantee that plaintiffs will prevail on the merits once they are afforded an administrative hearing, assuming —as we must—that plaintiffs believe in the validity of their case, the total amount of money at stake in this proceeding—$20,000 every year —certainly provided the plaintiffs with a substantial financial incentive to pursue this litigation.

Furthermore, contrary to the court's suggestion (*ante*, p. 143), this litigation will provide a substantial monetary benefit to the individual officers even if they do not ultimately prevail on the merits after an administrative hearing. The reduction in the officers' salaries proposed by the city was scheduled to take effect early in 1980, but that reduction has been stayed during the course of this litigation by an injunction issued by the trial court. As a consequence, the lawsuit to date has apparently permitted plaintiffs to receive more than $40,000 in additional income. Thus, even if we consider the matter solely from the point of view of the individual plaintiffs' financial interest, I do not see how we can conclude that the trial court *abused its discretion* in finding that in light of their personal stake in the litigation, the cost of the litigation—$8,400 in attorney fees—did not place a disproportionate burden on plaintiffs.[1]

In addition, it is not at all clear to me that the trial court—in conducting the "realistic assessment" of the situation mandated by *Wood-*

---

[1]The fact that other persons may gain the benefit of the general legal principle established in this case cannot, of course, in itself justify a fee award. As we explained in *Woodland Hills, supra*, 23 Cal.3d 917, 946: "Although 'it is a built-in consequence of [the Anglo-American principle of] stare decisis that "a legal doctrine established in a case involving a single litigant characteristically benefits all others similarly situated"' [citations], the doctrine of stare decisis has never been viewed as sufficient justification for permitting an attorney to obtain fees from all those who may, in future cases, utilize a precedent he has helped to secure. [Citations.] As the Second Circuit Court of Appeals stated in rejecting a plea for attorney fees based on a comparable theory: 'It is a novel assertion that attorneys who are victorious in one case may, like the holder of a copyright, claim fees from all subsequent litigants who might rely on or use it in one way or another.' [Citation.]"

*land Hills* (see 23 Cal.3d at pp. 938, 940, 941-942 & fn. 13)—was required to confine its consideration to the financial costs and benefits of the four individual plaintiffs. The record discloses that the attorney fees at issue have not been paid by the individual plaintiffs; instead, this litigation has been financed by plaintiffs' employee association—the Los Angeles Police Protection League. There is, of course, absolutely nothing improper in such an arrangement. (See, e.g., *Mine Workers* v. *Illinois Bar Assn.* (1967) 389 U.S. 217 [19 L.Ed.2d 426, 88 S.Ct. 353]; *Railroad Trainmen* v. *Virginia Bar* (1964) 377 U.S. 1 [12 L.Ed.2d 89, 84 S.Ct. 1113, 11 A.L.R.3d 1196].) Nonetheless, in determining whether a private attorney general fee award is needed to insure that lawsuits will be brought to enforce a ́particular statutory policy, it seems eminently reasonable for a trial court to consider whether the existence of such an organization means that—as a practical matter—private lawsuits to enforce the enactment will in fact be forthcoming even without the promise of a private attorney general award.[2] Surely, when the role of the employees' association is taken into account, there can be no question but that the trial court did not abuse its discretion in concluding that an attorney fee award under section 1021.5 was not warranted in this case.

I would affirm the trial court judgment in its entirety.

**RICHARDSON, J.**—I respectfully dissent. In my view, matters relating to the employment, compensation and discipline of police officers are municipal affairs. Accordingly, chartered cities such as Los Angeles may make and enforce ordinances on these subjects without limitation or restriction by any contrary state law. This seems to me to be man-

---

[2]Unlike the legal aid offices and "public interest" law firms discussed in *Serrano* v. *Priest, supra,* 20 Cal.3d 25, 47-48, an employee organization—like the homeowners' association involved in *Woodland Hills*—is an organization which exists, in large measure, in order to further the common personal interests of its members. Insofar as a particular lawsuit is likely to provide direct benefits to a large number of members who are contributing to the legal fees, it would belie reality to ignore the members' collective interest in assessing whether the financial burden imposed by the lawsuit is "out of proportion" to the personal interests at stake in the matter.

Although the Court of Appeal decision in *County of Inyo* v. *City of Los Angeles, supra,* involved a public, rather than a private, entity, its reasoning is instructive on this point: "Inyo County went to court as champion of local environmental values, which it sought to preserve for the benefit of its present and future inhabitants. This action is not a 'public interest' lawsuit in the sense that it is waged for values other than the petitioner's. The litigation is self-serving. The victory won by the county in 1977 bulked large enough to warrant the cost of winning it. The necessity for enforcement by Inyo County did not place on it 'a burden out of proportion to [its] individual stake in the matter.' [Citation.]" (78 Cal.App.3d at p. 90.)

dated by article XI, section 5, subdivision (a), of the California Constitution which provides that "City charters ... shall supersede any existing charter, and with respect to municipal affairs shall supersede *all laws* inconsistent therewith." (Italics added.)

The majority concedes that the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.) "impinge[s] on the city's implied power to determine the manner in which its employees may be removed," as well as the city's "general regulatory power over the [police] department." (*Ante,* p. 138.) The act contains numerous restrictions upon the city's power to discipline its police officers, including provision for an administrative appeal following any "punitive action," broadly defined to include even mere reprimands or transfers. (Gov. Code, §§ 3303, 3304.)

Notwithstanding the breadth of article XI, section 5, subdivision (a), the majority concludes that "the maintenance of stable employment relations between police officers and their employers is a matter of statewide concern." (*Ante,* pp. 139-140.) The majority fails to appreciate that if "stable employment relations" with public employees were the dispositive factor, *every* state law which called for terms or conditions of public employment less restrictive than those required by municipal charter would override all conflicting local ordinances on the subject. We have previously rejected any such approach. (See, e.g., *Ector v. City of Torrance* (1973) 10 Cal.3d 129, 132-133 [109 Cal.Rptr. 849, 514 P.2d 433] [local residence requirement for city employees overrides contrary state law]; *Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 62-63 [81 Cal.Rptr. 465, 460 P.2d 137] [state prevailing wage law inapplicable to charter city employees].)

In the context of employment relations, the state Constitution seems to me to be quite explicit in establishing supervision of city police as a "municipal affair." Not only does the Constitution provide that charter provisions regarding municipal affairs "shall supersede" any contrary state laws, but *the very next subdivision* of article XI empowers cities to provide by charter for "the constitution, regulation, and government of the city police force ...." (*Id.,* § 5, subd. (b).) *That same subdivision* also recites that "*plenary authority* is hereby granted [charter cities] ... to provide ... the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees ... shall be elected and appointed, and for their removal, and for their compensation, and for the number of ... em-

ployees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such ... employees." (*Ibid.*, italics added.)

It is difficult for me to see how the framers of our Constitution could have been more explicit in declaring their intention that the employment and regulation of local police officers be considered "municipal affairs."

The express constitutional grant of "plenary authority" to charter cities furnishes conclusive "constitutional guidance" in this regard. (See *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 316-317 [152 Cal.Rptr. 903, 591 P.2d 1]; *Ector* v. *City of Torrance, supra*, 10 Cal.3d 129, 132.) As was recently expressed in *Brown* v. *City of Berkeley* (1976) 57 Cal.App.3d 223, 236 [129 Cal.Rptr. 1], "'It has been uniformly held that the organization, maintenance and operation of a police and fire department by a chartered city is a municipal affair and as such not subject to the control of the legislature.' [Citation.] Moreover, under article XI, section 5(b), of the California Constitution chartered cities are specifically provided the authority to constitute, regulate and govern city police departments."

The majority relies for its contrary conclusion almost exclusively upon *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276 [32 Cal.Rptr. 830, 384 P.2d 158], but that case is inapposite. It held only that the right of municipal employees to join a labor union was a matter of statewide rather than municipal concern. This holding is correct, but I see no inconsistency between it and the views which I herein express. Union activities neither directly nor inevitably conflict with nor infringe upon the cities' constitutional power to employ, compensate and discipline its own municipal employees.

I would reverse the judgment.