[No. C017076. Third Dist. Nov. 22, 1994.]

CALIFORNIA LICENSED FORESTERS ASSOCIATION, Plaintiff and Respondent, v.
STATE BOARD OF FORESTRY et al., Defendants and Appellants.

COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter E. Wunderlich, Assistant Attorney General, and M. Anne Jennings, Deputy Attorney General, for Defendants and Appellants.

Ronald A. Zumbrun, Robin L. Rivett and Jennifer M. Deming for Plaintiff and Respondent.

OPINION

**PUGLIA, P. J.**—Defendants appeal from an order of the trial court granting plaintiff's motion for attorney fees following voluntary dismissal of the underlying action.[1] We shall conclude the cost of litigation was not out of proportion to plaintiff's individual stake in the outcome, and therefore plaintiff was not functioning as a private attorney general. (See Code Civ. Proc., § 1021.5.) Accordingly, we shall reverse.

I

The underlying dispute involves a challenge to emergency regulations and guidelines adopted without notice or public hearing by defendant California State Board of Forestry (Board) pursuant to its rule making powers under the Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq., hereafter the Forest Practice Act). The Forest Practice Act governs harvesting of timber on nonfederal land within the State of California (Pub. Resources Code, §§ 4513, 4526) and is designed "to encourage prudent and responsible forest resource management calculated to serve the public's need for timber and other forest products, while giving consideration to the public's need for watershed protection, fisheries and wildlife, and recreational opportunities alike in this and future generations." (Pub. Resources Code, § 4512, subd. (c).)

■ Under the Forest Practice Act, logging on covered timberlands cannot proceed without approval of a "timber harvest plan" (THP) by the Director of the California Department of Forestry (CDF). (Pub. Resources Code, § 4581; *Environmental Protection Information Center, Inc.* v. *Johnson*

---

[1]An order awarding attorney fees is collateral to the main action and separately appealable. (*Henneberque* v. *City of Culver City* (1985) 172 Cal.App.3d 837, 841-842 [218 Cal.Rptr. 704].)

(1985) 170 Cal.App.3d 604, 609 [216 Cal.Rptr. 502].) "The THP is an informational document designed to serve as an 'abbreviated' environmental impact report, setting forth proposed measures to mitigate the logging operation's potential adverse impact on the environment. CDF and public review of the THP prior to approval is intended to ensure that the adverse environmental effects are substantially lessened, particularly by the exploration of feasible less damaging alternatives to the proposed harvesting project." (*Environmental Protection Information Center, Inc.* v. *Johnson, supra*, 170 Cal.App.3d at pp. 609-610.)

The Board is required by the Forest Practice Act to adopt rules and regulations relating to all phases of timber operations, including the preparation of THP's. (Pub. Resources Code, §§ 4551, 4551.5.)[2] These rules and regulations must be reviewed continuously and may be revised as necessary to meet changing circumstances and to further the intent and purposes of the Forest Practice Act. (Pub. Resources Code, § 4553.)

Normally, the Board may not adopt or revise rules or regulations without first providing notice and a public hearing. (Pub. Resources Code, § 4554.) However, "[i]f the [B]oard finds that the intent of [the Forest Practice Act] has not been provided for in the rules and regulations, the [B]oard shall act to amend the rules by emergency regulation in accordance with Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. The [Director of Forestry] shall act upon the plan within 15 days of the [B]oard's action. Emergency regulations adopted pursuant to this section shall be effective for not more than 120 days. The regulations may be made permanent if the [B]oard acts to adopt or revise its rules and regulations pursuant to procedures established in this article for the adoption of other than emergency regulations." (Pub. Resources Code, § 4555.)

A Board determination that an emergency exists requiring immediate regulatory action must be supported by a written statement containing the

---

[2]Public Resources Code section 4551.5 reads in relevant part: "Rules and regulations shall apply to the conduct of timber operations and shall include, but shall not be limited to, measures for fire prevention and control, for soil erosion control, for site preparation that involves disturbance of soil or burning of vegetation following timber harvesting activities conducted after January 1, 1988, for water quality and watershed control, for flood control, for stocking, for protection against timber operations which unnecessarily destroy young timber growth or timber productivity of the soil, for prevention and control of damage by forest insects, pests, and disease, for the protection of natural and scenic qualities in special treatment areas identified pursuant to subdivision (b) of Section 30417, and for the preparation of timber harvesting plans."

information specified in Government Code section 11346.5, subdivision (a)(2) through (a)(6), as well as "a description of the specific facts showing the need for immediate action." (Gov. Code, § 11346.1, subd. (b).)[3]

On October 16, 1991, the Board invoked its emergency rulemaking powers and adopted temporary regulations (the emergency regulations) purportedly increasing the requirements of a THP and shifting the emphasis of the Forest Practice Act from production of lumber to protection of wildlife.[4] These emergency regulations became effective on November 25, 1991.

Plaintiff California Licensed Foresters Association (CLFA) filed this action on December 31, 1991, claiming the emergency regulations adversely affect the livelihood of its members and are not supported by a bona fide emergency. CLFA is a nonprofit association of "registered professional foresters" and related professionals who provide services to private timberland owners in connection with the preparation of THP's. Two large timberland owners, Arcata Redwood Company (Arcata) and Louisiana-Pacific Corporation (Louisiana-Pacific), filed separate lawsuits challenging the regulations. The three matters were ultimately consolidated by the trial court.

CLFA moved for a preliminary injunction barring enforcement of the emergency regulations. The trial court granted the motion on February 18, 1992, concluding CLFA is likely to prevail on the merits of its claim that the Board's statement of emergency is inadequate and the balance of equities favors CLFA.

Eight days later, the Director of CDF issued a memorandum entitled "California Department of Forestry and Fire Protection Timber Harvesting Plan Evaluation Guidelines." An updated version of this memorandum was

---

[3]Government Code section 11346.5, subdivision (a)(2) through (a)(6) require that the written statement contain references to statutory authority for the regulations and an enumeration of the provisions affected, a summary of applicable existing law, a determination of whether a local mandate is involved and whether such mandate requires state reimbursement, an estimate of costs or savings from the regulation, and any other matters prescribed by statute for the specific agency involved.

[4]For example, the emergency regulations required that THP's submitted by owners of at least 500 acres contain "a 100-year plan," including a projection of inventory, a description of how harvesting will provide for long-term conservation of wildlife, and an explanation of how future growth will replace any excess harvesting in prior years. THP's must also describe significant impacts on wildlife from harvesting and proposed mitigation measures. The emergency regulations also contained limitations on harvesting of timber in old-growth and ancient forests and special protection for watersheds and domestic water supplies.

issued on March 10, 1992. These documents (hereafter collectively the guidelines) were purportedly intended as directives to CDF in performing its THP review functions.

CLFA, Louisiana-Pacific, and Arcata filed an application for order to show cause re contempt regarding the guidelines, claiming they were an attempt to circumvent the injunction. The court denied the request, concluding "the thrust of the guidelines is fundamentally different from that of the enjoined regulations." The court also denied Arcata's motion for temporary restraining order regarding enforcement of the guidelines, concluding Arcata is not likely to prevail on the merits.

On June 22, 1992, CLFA filed an amended complaint containing allegations that the guidelines are an attempt to evade the injunction and were not enacted in accordance with the Administrative Procedures Act. The trial court denied cross-motions for summary adjudication and the matter was set for trial. On March 3, 1993, following adoption of permanent regulations, CLFA filed a request for voluntary dismissal. CLFA then sought and obtained an award of attorney fees in the amount of $42,940.[5]

## II

The Board contends the circumstances of this case do not warrant an award of attorney fees under Code of Civil Procedure section 1021.5 (hereafter section 1021.5). In the alternative, the Board urges a reduction in the amount of the award commensurate with the extent of CLFA's lack of success on its claims.

Section 1021.5 codifies the "private attorney general" doctrine under which attorney fees may be awarded to successful litigants.[6] "The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing

---

[5]Also named as a defendant is Richard Wilson, the Director of CDF. The award of attorney fees was made against Wilson as well, and he appeals along with the Board. Hereafter, references to the Board will include both defendants.

[6]Section 1021.5 provides in relevant part: "Upon motion, a court may award attorney[] fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or non pecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. [Citations.]" (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].) Entitlement to fees under section 1021.5 requires a showing that the litigation: "(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter." (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 142 [185 Cal.Rptr. 232, 649 P.2d 874].)

■ The decision whether to award attorney fees lies within the discretion of the trial court and will not be disturbed on appeal absent a prejudicial abuse of discretion resulting in a manifest miscarriage of justice. (*Baggett* v. *Gates, supra*, 32 Cal.3d at pp. 142-143.) However, "discretion may not be exercised whimsically and, accordingly, reversal is appropriate 'where no reasonable basis for the action is shown.' [Citation.]" (*Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 837 [160 Cal.Rptr. 465].)

■ The Board contends none of the prerequisites to an award of attorney fees is satisfied here. According to the Board, the suit produced no lasting results, only a premature expiration of the emergency regulations. This, the Board argues, was neither a substantial benefit nor of value to a large class of persons over and above the CLFA membership. The Board further contends the cost of litigation, amounting to approximately $60 per member,[7] was not out of proportion to CLFA's stake in the outcome. We shall address the latter contention first.

In its order awarding attorney fees, the trial court explained its reasoning as follows: "The burden on plaintiff in seeking enforcement of these rights should not be borne by them or passed on to their members. The Court finds that plaintiff successfully fought a governmental regulatory body's arbitrary proceedings [and stopped] it from placing regulatory hurdles in the paths of many people, besides members of plaintiff CLFA, whose economic and social well being [*sic*] would have been negatively affected by the emergency regulations. *The Court finds that this broad public interest considerably outweighs whatever private pecuniary or economic interest the plaintiff or its members might have.*" (Italics added.)

As evident from the italicized portion, the trial court applied the wrong test to determine if the third requirement for an award of attorney fees had

---

[7]According to Robert Rynearson, CLFA's president, CLFA has approximately 700 members. Prorated, the attorney fees award of $42,940 amounts to $61.34 per member.

been met. Entitlement to such an award does not turn on a balance of the litigant's private interests against those of the public but on a comparison of the litigant's private interests with the anticipated costs of suit. (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 113 [212 Cal.Rptr. 485].) ■ Section 1021.5 is intended as a "bounty" for pursuing public interest litigation, not a reward for litigants motivated by their own interests who coincidentally serve the public. (166 Cal.App.3d at p. 114; *Beasley* v. *Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1414 [1 Cal.Rptr.2d 459].) "The private attorney general theory recognizes citizens frequently have common interests of significant societal importance, but which do not involve any individual's financial interests to the extent necessary to encourage private litigation to enforce the right. [Citation.] To encourage such suits, attorneys fees are awarded when a significant public benefit is conferred through litigation pursued by one whose personal stake is insufficient to otherwise encourage the action." (*Beach Colony II* v. *California Coastal Com.*, *supra*, 166 Cal.App.3d at p. 114; *Woodland Hills Residents Assn., Inc.* v. *City Council*, *supra*, 23 Cal.3d at p. 941.)

■ CLFA argues it had no personal motivation for bringing this action because, as an entity separate from its members, CLFA had no financial stake in the outcome. Furthermore, CLFA argues, the $42,940 cost of litigation is significantly out of proportion to its exiguous means. Regarding this latter argument, CLFA notes its entire operating budget for 1993 was only $51,690.

These arguments are not persuasive. In its representative capacity, CLFA had a financial stake in pursuing this matter to the same extent as its members. CLFA's very existence depends upon the economic vitality of its members and any benefit or burden derived by CLFA from this lawsuit ultimately redounds to the membership. As to CLFA's financial status, our concern under section 1021.5 is whether CLFA "had an *individual stake* that was out of proportion to the costs of litigation . . . , not whether [it was] financially able to bear the costs. Financial status is not the criterion. . . ." (*Citizens Against Rent Control* v. *City of Berkeley* (1986) 181 Cal.App.3d 213, 231 [226 Cal.Rptr. 265], citations omitted and italics in original.)

As is evident from the several declarations submitted in support of the motion for preliminary injunction, CLFA had a significant pecuniary interest in eliminating the emergency regulations. William D. Solinsky, a registered professional forester and member of CLFA, indicated the vast majority of his company's income is derived from preparing THP's and the emergency

rules will have "a dramatic impact" on the continued operation of his business. According to Solinsky, the emergency regulations are so comprehensive and vague that foresters will have difficulty preparing THP's which comply, thereby risking disciplinary action by the Board.

Solinsky continued: "Due to the vagueness of the emergency rules, my clients are reluctant to employ my services. At the present time my new accounts have decreased by 100 [percent]. [W]hen my current workload is completed and during the period while these rules are in effect, there will be a lack of available work for me and my employees. This will have a devastating and irreparable impact on my business. . . . Such a temporary interruption of my business will no doubt cost me some of my valuable clients and some of my long term valuable employees." Finally, Solinsky indicated the new rules will increase the cost of THP's and harvesting to such an extent that many nonindustrial timberland owners will be unable to afford his services.

George Gentry, another registered professional forester and member of CLFA, explained that foresters such as himself make their living providing professional services to nonindustrial timberland owners. Regarding the effect of the emergency regulations, Gentry stated: "If these regulations are not rejected, the vast majority of non-industrial private timberland owners will not be able to afford the costs of hiring a consultant forester for preparation and supervision of required plans. . . . Most likely, landowners will choose to divest their properties or develop them in other economically viable ventures. . . ." According to Gentry, the emergency regulations "will result in the practical demise of the profession of independent consulting forester."

Yet another registered professional forester and member of CLFA, Richard Cox, agreed the emergency regulations "have essentially stopped the THP review process." According to Cox: "[I]t would be futile to attempt to submit a THP during the period these emergency rules are in effect due to, in many instances, the lack of clarity and the volume of information that will have to be prepared and which may be of no use after 120 days."

CLFA is an association of professionals providing services to the timber industry. The livelihood of CLFA members is largely dependent upon the continued harvesting of timber which in turn hinges on the requirements for THP's and the restrictions on harvesting imposed by the Board in its rules and regulations. If, as the foregoing declarants asserted, the emergency

regulations would have suspended the preparation of THP's and the harvesting of timber during the 120 days they were in effect, the income of CLFA members would have been reduced significantly. This temporary elimination of business might also have had permanent adverse effects. These are significant pecuniary concerns to CLFA and its members and, in relation to the costs of litigation, require no further incentive for bringing suit.[8]

CLFA contends, despite its own financial stake in the outcome, an award of attorney fees is not precluded because the overall motivation for this litigation was "to promote adherence to administrative due process, good forest resource management, and a healthy economy in California communities dependent upon timber resources." CLFA relies on *Planned Parenthood* v. *Aakhus* (1993) 14 Cal.App.4th 162 [17 Cal.Rptr.2d 510] (hereafter *Aakhus*), in which the Court of Appeal upheld an award of attorney fees to an abortion clinic which had sued to enjoin interruption of its business by protesters. Because the district attorney refused to prosecute the protesters without the clinic first obtaining a state court injunction and the clinic received no monetary award in the suit, the court concluded the cost of litigation was disproportionate to the clinic's stake in the matter. (14 Cal.App.4th at p. 173.) While recognizing the clinic had a sufficient business motive to bring the action, the court concluded the interests of the clinic and its clients "are mutual and inseparable." (*Ibid.*) Hence, the matter could not be viewed simply as "a self-serving, private dispute commenced by [the clinic] to protect its own pocketbook." (*Ibid.*)

CLFA contends the instant matter is analogous to *Aakhus* because the interests of its members are "mutual and inseparable" from those of the timberland owners and the general public. We disagree. The interests of CLFA's members are not necessarily coterminous with those of its clients and the public. If, as the declarations suggest, the emergency regulations would have caused timberland owners to forego harvesting operations, such owners might nevertheless have decided to make other productive use of their land. For example, timberland owners could have sold their interests to larger entities which could have afforded to harvest the timber under the revised regulations. While this would not benefit CLFA, which relies on owners of smaller tracts for business, it would presumably mitigate any damage to timberland owners and the public.

---

[8]CLFA contends the declarations noted above establish no more than its standing to bring this action. We disagree. Assertions that the emergency regulations will effectively eliminate the business of CLFA members for a significant period and have permanent adverse effects go well beyond the necessary showing of "injury in fact" necessary for standing. (See generally, *Lujan* v. *Defenders of Wildlife* (1992) 504 U.S. 555 [119 L.Ed.2d 351, 112 S.Ct. 2130].)

The present matter is more analogous to *Planned Parenthood* v. *City of Santa Maria* (1993) 16 Cal.App.4th 685 [20 Cal.Rptr.2d 391], in which the same court that decided *Aakhus* upheld a denial of attorney fees to Planned Parenthood. Planned Parenthood had submitted a grant proposal to the city for $60,000 to construct a new clinic and the city approved the grant on the condition no abortions be performed. Planned Parenthood filed a complaint for declaratory and injunctive relief which was granted by the trial court.

In affirming the denial of attorney fees, the Court of Appeal explained: "There is no doubt that the controversy touched upon the constitutional right of privacy. However, the interests of the clinic patients and general public were incidental to Planned Parenthood's primary objective of obtaining grant money. . . . No evidence was presented that the litigation transcended Planned Parenthood's financial interests and imposed a financial burden disproportionate to its individual stake in the matter. . . ." (*Planned Parenthood* v. *City of Santa Maria, supra,* 16 Cal.App.4th at p. 691, citations omitted.)

The court distinguished *Aakhus* as follows: "Nothing in our recent opinion in [*Aakhus*] compels an award of fees here. There, Planned Parenthood was directly protecting the constitutional right of privacy. It had to, on its own, seek and obtain a state court injunction prohibiting trespass at its Santa Barbara clinic. The district attorney refused to enforce a previously obtained federal injunction. (*Id.* at p. 167.) [¶] Here, by contrast, Planned Parenthood was not directly seeking to protect the constitutional right of privacy. It was seeking money and was but one of several grant applicants for a limited amount of public funds." (*Planned Parenthood* v. *City of Santa Maria, supra,* 16 Cal.App.4th at p. 692.)

As in *Planned Parenthood* v. *City of Santa Maria, supra,* the interests of CLFA clients and the general public were only incidental to CLFA's primary objective of protecting the livelihood of its members. The economic interest of CLFA and its members was sufficient motivation for bringing this action. An award of attorney fees therefore exceeded the trial court's discretion.[9]

---

[9]CLFA also relies on *Baggett* v. *Gates, supra,* 32 Cal.3d 128 and *Henneberque* v. *City of Culver City, supra,* 172 Cal.App.3d 837, which held police officers pursuing rights under the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.) are entitled to attorney fees despite personal benefits received in the litigation. However, in both cases personal benefit was out of proportion to costs of suit because pecuniary recovery was either speculative or slight. Here, the benefit to CLFA was substantial. Rather than merely giving

## III

Having concluded the costs of litigation were not out of proportion to CLFA's stake in the litigation, we need not address the Board's other challenges to the attorney fee award. The judgment (order) is reversed and the matter remanded with directions to enter an order denying CLFA's motion for attorney fees. The Board shall recover costs on appeal.

Blease, J., and Sims, J., concurred.

A petition for a rehearing was denied December 20, 1994, and respondent's petition for review by the Supreme Court was denied February 2, 1995.

---

the plaintiff an opportunity to prove entitlement to relief, as in *Baggett* and *Henneberque*, a favorable result here eliminated the entire threat to CLFA's economic interests.