175 Cal.App.4th 940 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
ARTURO JESUS HERNANDEZ, Defendant and Appellant.
In re ARTURO JESUS HERNANDEZ on Habeas Corpus.
Nos. A119501, A124474.
Court of Appeals of California, First District, Division Two.
July 10, 2009.
*944 Gail E. Chesney, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Joan Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
KLINE, P. J. 
Arturo Jesus Hernandez appeals from a conviction of assault with a deadly weapon and by force likely to produce great bodily injury. He contends the judgment must be reversed due to the trial court's placement of a uniformed and armed bailiff behind him while he testified and refusal of a defense request for an instruction directing the jury to disregard the bailiff's placement. He further contends the great bodily injury enhancement must be reversed because the trial court failed to instruct the jury that the enhancement allegation had to be proven beyond a reasonable doubt, the trial court failed to recognize and exercise its discretion to strike the enhancement, and defense counsel's failure to request the court to strike the enhancement denied appellant effective assistance of counsel.
In a petition for writ of habeas corpus, appellant contends he was denied effective assistance of counsel by his trial attorney's failure to object to the bailiff's placement until after the first portion of appellant's testimony and failure to request that the court exercise its discretion to strike the great bodily injury enhancement.
We conclude appellant's conviction must be reversed and find it unnecessary to address the habeas corpus petition.

STATEMENT OF THE CASE
Appellant was charged by information filed on May 18, 2007, with one count of assault by a deadly weapon and by force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(1).)[1] It was alleged that in the commission of this offense appellant personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)), and that the charged offense was a serious felony within the meaning of section 1192.7, subdivision (c).
*945 Jury trial began on July 11, 2007. On July 17, the jury found appellant guilty of assault with force likely to produce great bodily injury and found the personal infliction of great bodily injury enhancement allegation true. The jury found appellant not guilty of assault with a deadly weapon.
Appellant was sentenced on September 28, 2007, to a total prison term of five years, consisting of the lower term of two years for the assault and a consecutive three years for the great bodily injury enhancement.
Appellant filed a timely notice of appeal on September 28, 2007.

STATEMENT OF FACTS
A tape was played for the jury in which an anonymous caller reported to the 911 operator that he had just seen someone "getting beat up" at Lone Tree Way and Putnam Street in Antioch. The caller said it looked like a man beating up a woman and described, "he had her in a [sic] arm lock and he was hitting her and slapping her and threw her all to the ground. Now they're walking away." Asked whether the victim needed an ambulance, the caller said the woman "apparently seems to be okay, she's walking behind him, but I'm sure she's hurt because he was hitting her with all his strength." The caller reported that the two people were heading toward Putnam and stopped at a gas station on the corner, where "a whole bunch of people" were trying to talk to them.
Deva Belarde testified that she met appellant about a week and a half before March 11, 2007, at a bus stop outside the senior center where she did volunteer work. A few days later, she saw appellant outside Lone Tree Liquors and asked if he was hungry; he said he was not and Belarde left. On March 10, Belarde saw appellant again at the liquor store when they were both buying beer. She asked again if he was hungry and invited him to her house to drink beer. Appellant had marijuana and wanted to see if Belarde knew anyone who wanted to buy some, but she did not. The two walked around the corner to Belarde's house, where they drank their beer and talked for 20 or 25 minutes. Appellant did not eat dinner and left when Belarde's fiancé politely asked him to do so. Belarde testified that she invited appellant over because he looked tired and a little bit dirty and she thought he might be hungry. She said she did this "a lot of times with people" and enjoyed the company, and appellant "seemed to be friendly."
Around 10:00 or 10:30 p.m. the next night, March 11, Belarde went to the liquor store, saw appellant sitting outside, drinking a 16-ounce beer and asking people for money. She sat down and talked with appellant and other people in the area for more than an hour, drinking half of a half-pint of vodka *946 she had purchased at the Quik Stop market across the street and a 16-ounce beer appellant bought her. Belarde testified that she had had a 40-ounce beer at around 2:00 p.m. and another around 6:00 p.m., that she drank a lot of beer, and that a 40-ounce beer was "normal" for her and did not make her feel drunk. On cross-examination, Belarde stated that she had had a 40-ounce beer, a 16-ounce beer and half a pint of vodka while sitting with appellant; she acknowledged having told a defense investigator in May 2007 that she had drunk the whole half-pint of vodka but stated this was not in fact correct. She did not remember what she told Officer Hewitt about how much she had had to drink but agreed that if she had told him just one 40-ounce beer, that would not have been true. She acknowledged that when interviewed by Officer Bergerhouse about a week after the incident, she mentioned the beer she had consumed but not the vodka. She also acknowledged that she was "panhandling" while she visited with appellant, although she stated she only asked people she knew for money. Belarde testified that although she felt sober when she got to the liquor store, after sipping half the bottle of vodka, she was starting to feel the effect of the alcohol, "catching a small buzz." Appellant consumed a 32-ounce beer after the 16-ounce one he was drinking when Belarde arrived.
Belarde testified that she and appellant had a disagreement when he wanted to go to the bus stop: She wanted to help him get there because he was "staggering somewhat," but appellant wanted to walk by himself. After they crossed the street, Belarde put her hand on appellant's shoulder. As they reached Sylvia's Kitchen, appellant raised his voice, accusing Belarde of being a prostitute in what she felt was an attempt to insult her. He expressed some more "vulgarities" and she became upset, pushed him with the hand on his shoulder and started to turn and walk away. At this point they were in front of a gas station. Appellant grabbed her by the shoulder and arm, turned her around and punched her in the left eye, causing her to get dizzy. She shoved him again, this time from behind. Appellant shoved her and hit her on the side of her face with a "stick" or "branch" he had picked up from a planter by Sylvia's Kitchen. She fell down and was bleeding, then got up and went to the gas station. Appellant ran up a hill toward a church behind the gas station. Belarde fell down again by the pumps at the gas station. She later identified the branch appellant had hit her with from two shown to her by the police, choosing it because the other one she was shown had leaves on it and was "more like a stick."
On cross-examination, Belarde testified that she told the defense investigator that appellant wanted her to walk him to the bus stop but then complained as they got closer to it. She remembered attempting to hold appellant up, but did not remember whether she had told the defense investigator this. She did not remember telling the investigator that appellant told her to stop "pulling on" him or that he accused her of attempting to steal $10 from him, but *947 testified that appellant did not make this accusation. She also testified, despite her previous statements to the contrary, that she did not push or shove appellant during the incident.
Belarde testified that she did not have a weapon with her, did not punch, kick or slap appellant and did not try to take his wallet. She was 49 years old, four feet 11 inches tall and weighed about 155 pounds. The amount she had had to drink that day was normal for her and made her feel "[h]appy." Walking with appellant that night, she felt "buzzed" but not "out of control." Belarde testified that she felt tired and sometimes got the "shakes" when she did not drink. She denied having ever had blackouts or seizures related to her alcohol consumption, but her medical records reflected several such incidents.[2] Belarde had been unemployed for about three years.
Photographs were taken of Belarde's injuries, which showed her left eye was swollen and there was broken skin and bleeding under that eye. Belarde testified that she did not require stitches or surgery and was released from the hospital the same day. She testified that she lost consciousness on the night of the assault but did not know for how long. At the time of trial, she still felt pain on her left cheekbone and left temple when she touched them, and her eye still felt swollen. She also had trouble sleeping, had nightmares, and felt an "extreme amount of stress" caused by this case.
On cross-examination, when asked about statements she had made to medical personnel, police and a defense investigator, there were many details Belarde said she did not recall. She remembered telling the ambulance personnel that she had been hit in the face with a stick or branch by a man who was trying to rob her, but testified that in fact appellant did not try to rob her. She remembered telling a doctor at the hospital that she drank about a six-pack a day. Belarde testified that her recollection of some parts of the incident were vague because she had been "blocking out things since the incident" because she did not want to relive it. She testified at one point that she did not know whether her drinking affected her memory and at another point that it did not.
Antioch Police Officer B.J. Hewitt was dispatched to the Valero gas station on Lone Tree Way about 10:25 p.m. on March 11, 2007, based on a report of a woman having been badly beaten. Several officers were on the scene and Hewitt saw an ambulance departing. Hewitt and other officers began a search *948 for the suspect, who had been described as a Hispanic male with salt-and-pepper hair, wearing black jeans and a white shirt. Appellant was found sitting on the ground between shrubs next to a fence by a church, some 200 to 300 yards from the gas station. He was arrested without incident. Hewitt could smell alcohol on his person and saw that his knuckles were bleeding and he had a scrape on his forearm.
When Hewitt took a statement from Belarde at the hospital, she smelled strongly of alcohol, was "very upset, traumatized" from the incident, was shaking a little bit and was bruised and bleeding from her face. In the interview, a tape of which was played for the jury, Belarde said appellant had gotten drunk and wanted to go home to his daughter's house; she tried to walk him to the bus and he "snapped" and hit her face. She said appellant hit her three, four or five times with his fists and then once with a stick, by the Shell station. She said she had known appellant for two weeks and that she had had a 40-ounce "King Cobra" to drink, which she had gotten from the Quik Stop. Hewitt testified that he asked if Belarde had asked appellant for money and she said she had not, but appellant had tried to borrow money from her. Hewitt looked for the stick along the route Belarde described having walked but did not find it.
Antioch Police Officer Steve Bergerhouse searched the area on March 12 for a stick that might have been out of place or broken from a tree. He found a long stick across from Sylvia's Kitchen that was three to four feet long and half an inch in diameter, and another stick, about a foot long and three-quarters of an inch in diameter, about three feet up the embankment at the rear of the Valero gas station. Belarde identified the shorter stick as the one used in the assault. There was no blood on the stick and it was not tested for DNA. The stick did not match the trees on the embankment. Bergerhouse attempted to view video surveillance tapes from the gas station, but it appeared the equipment had not been working.
Bergerhouse interviewed Belarde on March 19. She seemed "real frail," had a hard time standing at times and was "very shaky." Her left eye was closed and swollen and the left side of her face was bruised; her hands were trembling when the officer had her sign some forms. Belarde did not smell of alcohol. She told Bergerhouse that appellant had told her he had $50 and there was a rumor she was a prostitute, and that appellant "snapped" when they got close to the Valero station and began to punch her with his fists. She did not try to hit him back and tried to cover her face; he picked up a wooden stick and hit her face one time, she fell to the ground and he ran toward the Valero station. When Bergerhouse asked Belarde about having told Hewitt the beating took place in front of the Shell station, she clarified that it actually was on the other side of the street. She told Bergerhouse that she had had two *949 beers, whereas she had told Hewitt she had only had one. Bergerhouse testified that, in his experience, victims' stories "tend to waiver" from the original statements at the time of the incident to subsequent statements to an investigator. Bergerhouse acknowledged some inconsistencies between what Belarde told him and statements he subsequently saw reflected in her medical records, including her having told the emergency room physician she had been assaulted by someone she did not know and had been kicked as well as punched, but did not attempt to ask Belarde about them. Bergerhouse testified that Belarde's injuries, statements and medical records were consistent with what he found in his investigation, and her statements to him were consistent with what she told Hewitt and "consistent days apart."

Defense
Paramedic Jennifer Matthews responded to the call involving Belarde on March 11, 2007. Belarde told her, "[m]y face is messed up," and said she had been "[h]it with a stick or branch one time in the face by a man who was trying to rob her." Belarde said she had consumed one quart of beer. Matthews testified that Belarde seemed upset but was not confused. She had bruising and swelling around her left eye and lip and two cuts, one under her eye and one on her lip. Belarde reported she had not lost consciousness.
Defense investigator Paige Devereaux spoke with Belarde briefly on April 26, and interviewed her on May 2, 2007. On both occasions, Belarde had a "strong odor" of alcohol. Belarde said she sat and visited with appellant outside the Quik Stop for a couple of hours on March 11, during which time she drank two 40-ounce beers and a half-pint of vodka. She said appellant might have bought her a beer but she could not really remember, and she was "buzzing" but not drunk. Belarde said she had known appellant for a week or two and had invited him to her home for dinner one night.
Belarde told Devereaux that appellant wanted her to walk him to the bus stop and that she was trying to hold him up and help him walk because he was drunk and walking "sideways." Belarde reported that appellant told her to stop "grabbing on him" and accused her of trying to steal $10 from him, and told Devereaux that she was not trying to steal money from him. Appellant then asked Belarde if she was a prostitute and she got upset and told him she was "not like that." Belarde said appellant pushed her down and hit her with a stick; she did not mention being punched and did not say she pushed appellant.
Appellant's version of the admitted altercation differed significantly from that of Belarde. He testified that he had met her two or three days before March 11, when she started to talk to him while he was drinking a beer and *950 panhandling outside Lone Tree Liquors. Belarde was drinking a 16-ounce beer and a "half pint of some clear liquid." They talked for half an hour to an hour, and Belarde invited appellant to her house for a drink. Appellant went to her house for no more than half an hour. He did not have any marijuana and did not offer to sell Belarde any.
The only other time appellant saw Belarde was on March 11. He and Belarde were both drinking and panhandling outside the liquor store. Appellant told Belarde he was going to leave and started to walk toward the bus stop beyond the Shell station. He walked on the same side of the street the liquor store was on, and did not cross to the side where Sylvia's Kitchen is located. Belarde, on appellant's left side, had hooked her arm around his arm and was asking why he had to leave so early. Appellant wanted to leave and go home to his brother's house because Belarde was "getting loud." Belarde asked appellant for money and he told her "no." She was "pawing" him, putting her arm around his waist after he pushed her arm away. She followed as appellant kept walking, continuing to ask for money, telling appellant he was a "nice guy" and "making motions" toward the wallet in appellant's back pocket. Appellant pushed her away and she came back, "pissed off" and calling him an "asshole." He told her to get away, saying "I know what you're after." He put out his arm to keep her away from him, but she pushed it aside and reached for his wallet. He got mad and pushed her "pretty much harder than before," and she "went down on one knee." Appellant tried to walk faster toward the bus stop and Belarde "just came at me just wild, screaming," hitting his back and reaching for his wallet. He turned around, mad, grabbed her and put her in a headlock, but she broke free. She came at him again, "swinging wildly and then yelling all kinds of stuff," and he turned around, grabbed her by the back of the neck and her jeans, and "threw her on her face." Appellant testified that he was "pretty pissed" and "just slammed her, threw her," and that he saw her land on her face and "I didn't mean to do that." When she got up, she was bleeding and swearing. He testified that he did not punch Belarde or "throw any blows," and denied having ever seen exhibit No. 6, the stick Belarde identified. Appellant agreed that Belarde sustained "serious injuries," but testified that he was defending himself against her assault and did not intend to cause the injuries.
Appellant testified that at the point Belarde was injured, they were about 15 yards from the Shell station, in a dirt area off the sidewalk. Some people from the Shell station came toward them. Appellant panicked and ran to the church parking lot, hiding behind bushes. When the police came, appellant felt they were going to arrest him for throwing Belarde down and no one would believe him. Appellant testified that he is five feet six inches tall and weighs 175 pounds, and that he had consumed two 16-ounce beers over the course of the day on March 11.
*951 Asked whether he had told the police, "`[s]he's a little girl, though, and I don't think she could do damage[;] [s]he punched me, but she didn't hurt me,'" appellant testified he did not remember saying this but he could have done so. He denied having said that Belarde thought he was a "`John'" or thinking that she was a prostitute. He initially stated that he did not remember telling the police that Belarde tried to stab him, then said "I think that was just the alcohol talking. I just didn't believe anybody was going to believe me." He acknowledged lying to the police, falsely telling them Belarde tried to stab him. Asked about having told the police he did not know Belarde and she might have recognized him "from someone else that she knows," appellant said he meant he did not know her "personally," having only met her two days before. He did not remember telling the police that Belarde dragged him down the block or chased him, and acknowledged this did not happen. Appellant did not remember telling the police that his knuckles got bloody because he fell when he pushed Belarde. He testified that the blood on his hands was from crawling through the bushes when he was hiding from the police.
The jury saw a videotape of appellant's interview by the police on March 11. Appellant stated that he had hit Belarde, but "I don't hit women but I [sic] was just self defense, man. She kept, she like, she dragged she chased me down the block." Appellant insisted he did not know Belarde before March 11, despite Officer Hewitt saying Belarde said she knew appellant, and said he met her for the first time that night, by the Shell station. Appellant said Belarde thought he was a "John" and asked if he wanted a date. After he declined, she demanded money from him and grabbed him as he walked away, "grabbing me by my t-shirt and she dragged me down on the gosh darn sidewalk." Appellant said Belarde hit him five or six times on his back; when the officer asked him to lift up his shirt, appellant said she was "a little girl" and he did not think she "could do damage." Appellant was "positive" the blood on his knuckles could not have been from hitting Belarde in the face and said he fell when he pushed her and she dragged him down, then later said the bloody knuckles were from when he was hiding on the hill. He said he was hiding in the bushes because he figured the people from the gas station wanted to beat him up. Asked why he continued to hide when he saw it was the police, not the people from the gas station, who had found him, appellant said, "I just wanted to sit and relax and try to get home to Brentwood." He then said he was hiding because he did not want to get arrested and thought no one would believe him about what had happened. When Officer Hewitt noted that appellant had said when he was arrested that Belarde had tried to stab him but had not mentioned this during the interview, appellant said she did try to stab him and "had a real knife." He told the officer he had had only one beer that day. He denied punching Belarde or hitting her with a stick.

*952 DISCUSSION

I.
Appellant argues that the trial court abused its discretion and violated his due process right to a fair trial by authorizing a uniformed and armed deputy sheriff to stand or sit behind him during his testimony and refusing his request for a cautionary jury instruction.
Appellant took the stand toward the end of the afternoon on July 16, and continued his testimony during the morning of July 17. Before he resumed testimony on the second occasion, defense counsel objected to the procedure employed the day before of having the armed deputy, who had been sitting behind appellant throughout the proceedings, walk behind him to and from the witness stand and stand closely behind him while he testified. Counsel explained she had not objected at the time because she did not want to highlight the issue in front of the jury. She argued that the procedure was inappropriate, noting that appellant was the only witness who received this treatment and she had never seen it happen in other trials. Defense counsel also emphasized that there had never been any allegation or showing that appellant presented a security risk while in custody or during his previous court appearances, or that he had ever previously been charged or arrested for a violent offense. The court indicated that appellant's propensity for violence, if any, was irrelevant, as it employed the challenged procedure routinely in all cases: "I've seen it happen in every trial I've ever done and that is because of security. And the defendant, as all defendants, even in a petty theft, if they sit there, a bailiff is supposed to sit behind them for security of the jury, for security of everyone." Defense counsel urged that having an armed court officer positioned behind appellant not just when he was seated at counsel table but also while he testified "is akin to having him shackled in front of the jury." The court disagreed, stating, "[a]nd, also, it's a [section] 245 [violation] with a very bad injury. I was actually afraid you were going to have him stand up and point to something, and he would get really close to a juror. No, the deputy will sit back there. He's not shackled, nothing. It's just what happens in every case that I've ever tried." Defense counsel objected to the procedure as "highly prejudicial," "very suggestive to the jury" and "more prejudicial than having him handcuffed in front of the jury." She asked the court at least to make an individualized finding regarding the risk appellant posed, pointing out that there had been no allegation appellant had been violent in custody or any of his other court proceedings. The court responded that it was a discretionary decision, appellant had "an 18-page rap sheet" and deserved "what every defendant deserves, and that is security for himself and for all the rest of us." When counsel argued the rap sheet included 30 years of history and included "mostly alcohol related offenses" such as public drunkenness, driving under the influence and violating restraining orders, the court *953 stated, "[a]nd burglary and restraining order violations, which means inability to follow the orders of the court. Kind of important, too." The court dismissed as irrelevant counsel's argument that the restraining orders involved appellant's ex-wife and the court had not determined whether the underlying circumstances involved violence, stating, "I don't need to. He what he does is he does not follow the orders of the Court."
The prosecution took no position on the propriety of the challenged security measure and did not participate at all in the colloquy between court and counsel just described.
Subsequently, defense counsel asked the court for a jury instruction dealing with this issue, requesting that the court read the standard instruction not to consider the fact that a defendant was in physical restraints during trial, modified to replace "physical restraints" with "in custody."[3] The court declined, stating, "I actually think you're trying to make them feel sorry for him. You think you're trying to blunt it. But I think it just makes people sorry for him.... [¶] . . . [¶] He's not shackled, and he's not restrained. [¶] ... [¶] He simply sat next to him." Defense counsel urged, that when appellant testified, "he was the only witness with an armed guard standing behind him. Standing behind yesterday, sitting behind him today. It's equivalent to him being shackled." The court noted, "He's in plain clothes. He's reading a book. The jury has never seen him go in and out of any door. No, I'm not going to give it."
In closing argument, defense counsel told the jury that although the fact that appellant was the only witness to have an armed guard behind him communicated that he was guilty, the jury was not permitted to take this into consideration and had to impartially consider the evidence and apply the presumption of innocence.
(1) "Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that `one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" (Holbrook v. Flynn (1986) 475 U.S. 560, 567 [89 L.Ed.2d 525, 106 S.Ct. 1340] (Holbrook), quoting Taylor v. Kentucky (1978) 436 U.S. 478, 485 [56 L.Ed.2d 468, 98 S.Ct. 1930].) "To implement the presumption [of innocence], courts must be alert to factors that may undermine the fairness of *954 the factfinding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." (Estelle v. Williams (1976) 425 U.S. 501, 503 [48 L.Ed.2d 126, 96 S.Ct. 1691].)
In Estelle v. Williams, the court held unconstitutional the practice of forcing a defendant to wear prison clothing when appearing before the jury, explaining that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment" and "furthers no essential state policy." (Estelle v. Williams, supra, 425 U.S. at pp. 504-505.) Courts have similarly recognized that a defendant may be prejudiced if required to appear before the jury with visible physical restraints. (Deck v. Missouri (2005) 544 U.S. 622, 630-631, 635 [161 L.Ed.2d 953, 125 S.Ct. 2007] (Deck); Illinois v. Allen (1970) 397 U.S. 337, 344 [25 L.Ed.2d 353, 90 S.Ct. 1057] (Allen); People v. Duran (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322] (Duran).) "Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process," because it "suggests to the jury that the justice system itself sees a `need to separate a defendant from the community at large.'" (Deck, at p. 630, citing Estelle v. Williams, at p. 503, and quoting Holbrook, supra, 475 U.S. at p. 569.) It also diminishes the defendant's right to counsel by interfering with his or her "`ability to communicate'" with counsel and the "ability to participate in his own defense, say, by freely choosing whether to take the witness stand on his own behalf." (Deck, at p. 631, quoting Allen, supra, 397 U.S. at p. 344.) Use of visible physical restraints undermines the dignity of the courtroom, which "includes the respectful treatment of defendants." (Deck, at pp. 631-632.) Additionally, "[s]hackles may affect a defendant's mental state during trial" by causing the defendant to "`feel confused, frustrated, or embarrassed, thus impairing his mental faculties.'" (People v. Hill (1998) 17 Cal.4th 800, 846 [72 Cal.Rptr.2d 656, 952 P.2d 673], quoting Spain v. Rushen (9th Cir. 1989) 883 F.2d 712, 722.)
Courts have recognized, however, that use of physical restraints is sometimes necessary and that "in certain extreme situations, `binding and gagging might possibly be the fairest and most reasonable way to handle' a particularly obstreperous and disruptive defendant." (Holbrook, supra, 475 U.S. at p. 568, quoting Allen, supra, 397 U.S. at p. 344; see Deck, supra, 544 U.S. at p. 632.) Due to the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand, ... a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (Duran, supra, 16 Cal.3d at pp. 290-291.) "[D]ue process does not permit the use of visible restraints if the trial court has not taken account *955 of the circumstances of the particular case." (Deck, at p. 632.) When visible physical restraints are used, the trial court has a duty to instruct the jury sua sponte that the "restraints should have no bearing on the determination of the defendant's guilt." (Duran, at pp. 291-292.)
(2) Appellant likens the positioning of an armed deputy sheriff behind him during his testimony to that of a defendant forced to testify in shackles, communicating to the jury a need to restrain him from harming others or attempting to escape and supporting an inference that he was guilty of the charged assault. In general, courts have refused to view general security measures, such as the positioning of security personnel in the courtroom, as akin to use of physical restraints. (Holbrook, supra, 475 U.S. at pp. 568-569; People v. Marks (2003) 31 Cal.4th 197, 224 [2 Cal.Rptr.3d 252, 72 P.3d 1222] (Marks).) Holbrook held that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." (Holbrook, at pp. 568-569.) In Marks, our Supreme Court adhered to the "distinction between shackling and the deployment of security personnel, and decline[d] to impose the manifest need standard for the deployment of marshals inside the courtroom." (Marks, at p. 224.)
(3) Holbrook rejected a challenge to four uniformed state troopers sitting in the first row of the spectators' section during the trial. The court reiterated the principle that a defendant is entitled to have guilt determined solely on the basis of evidence introduced at trial, then explained: "This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained." (Holbrook, supra, 475 U.S. at pp. 567-568.)
"The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of *956 the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citation.]" (Holbrook, supra, 475 U.S. at p. 569.)
(4) Holbrook concluded that cases involving courtroom security measures should be reviewed on a case-by-case basis rather than pursuant to a "presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." (Holbrook, supra, 475 U.S. at p. 569.) The court declined to find "an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section," because it was "unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings," particularly as the case involved six defendants. (Id. at p. 571.)
Marks upheld a trial court's decision to position a marshal, during the defendant's testimony from the witness stand, sitting four or five feet from the defendant's side, next to and slightly behind one of the jurors. (Marks, supra, 31 Cal.4th at p. 223 & fn. 5.) This was an alternative adopted after the court declined defense counsel's request for physical restraints, based on one of the attorneys' fear of the defendant harming him and the other attorney's concern that the defendant's misconduct might harm the defense. The trial court instructed the jury not to speculate about why the deputy was seated by the jury box or let this influence its deliberations.[4]Marks found the procedure within the trial court's discretion: "Defendant had attacked his own counsel in the courtroom, and his disruptive behavior and violations of court orders had led to his removal at one point. The court observed the proximity of the witness stand to the jury box, and reasonably concluded it would be irresponsible to leave the jury unprotected from a capital defendant with a *957 record of violent behavior in the courtroom. Under any standard of review, the trial court properly exercised its discretion in securing the courtroom." (31 Cal.4th at p. 224.)
(5) Neither of these cases is dispositive of the one before us. The security officers in Holbrook, although placed near the defendant, sat behind him in the spectators' section of the courtroom; the show of security was not narrowly focused on the defendant in the way it necessarily is when a security officer accompanies the defendant to the witness stand. Accordingly, the court was able to say that jurors would not likely view the presence of the officers as anything more than normal courtroom security. That is clearly not here the case. When an armed guard escorts a defendant to and from the stand and remains closely behind him during his entire testimony, it is difficult to avoid inferring that the court or some other well-informed law enforcement authority sees a "need to separate a defendant from the community at large" or views the defendant as dangerous. (Holbrook, supra, 475 U.S. at p. 569.) Holbrook expressly acknowledged the possibility that "the sight of a security force within the courtroom might under certain conditions `create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'" (Ibid., quoting Kennedy v. Cardwell (6th Cir. 1973) 487 F.2d 101, 108.) By noting that security officers "placed at some distance from the accused" might be viewed as a measure of general courtroom security rather than "reminders of the defendant's special status," and that armed guards in public places "are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm" (Holbrook, at p. 569), the court clearly intimated that security officers placed in such a way as to highlight the defendant's custodial status or suggest official concern directed at the defendant would serve to diminish the presumption of innocence. Here, the armed bailiff escorted appellant to the witness stand and either stood or sat behind him throughout his testimony, a procedure which was not used with any other witness. Members of the jury, three of whom had previously served on juries in criminal cases, could not have failed to notice this unusual differential treatment of appellant and, as in the case of a shackled defendant, to have inferred from it "that he is a violent person disposed to commit crimes of the type alleged." (Duran, supra, 16 Cal.3d at p. 290.)
Though it involved capital crimes for which the death penalty was imposed, Marks is otherwise closer to the facts of the present case, as the guard there was also positioned close to the testifying defendant. What significantly differentiates Marks from this case, however, is the manifest need for security precautions of some sort and the trial court's individualized consideration of the matter. As earlier noted, both defense counsel in Marks had requested that their client be placed in restraints because he had previously assaulted one of his attorneys in court, and a deputy sheriff during *958 the case, and had been removed from the courtroom for disruptive conduct and violation of court orders. Employing the analysis suggested in Holbrook, the trial court in Marks determined that, in the specific circumstances presented, added security precautions were called for, but that a strategic positioning of the security guard was preferable to the use of physical restraints requested by defense counsel, which would more likely affect the jury.
Here, the record provides absolutely no basis for concern that appellant posed any threat to courtroom security. Nor did the trial judge think any such showing necessary. On the contrary, the court expressly stated that the positioning of an armed bailiff directly behind a defendant when he or she testified was a routine practice that the court would utilize even in a case of petty theft. While the court noted that appellant was charged with a violent offense and had a criminal history reflecting disregard for court orders, each of these observations, which were offered in response to defense counsel's argument that there was no indication appellant presented any security risk, was coupled with a reiteration of the court's view that it was employing a standard procedure applicable to all cases. Thus, after noting that appellant was charged with a violent offense, the court stated, "It's just what happens in every case that I've ever tried." After noting that appellant had an "18-page rap sheet," the court's last statement on the issue was, "I think he deserves what every defendant deserves, and that is security for himself and for all the rest of us." The court's refusal to consider individualized factors was perhaps most apparent in its response to defense counsel's observation that the court had not reviewed the contents of appellant's restraining order violations to determine whether any had involved violence: "I don't need to," the court replied, "[h]ewhat he does is he does not follow the orders of the Court." In sum, the court made abundantly clear that it was requiring appellant to testify with the bailiff standing or sitting directly behind him because this was the standard procedure invariably employed by the court in every case.[5] Nor did the trial court consider the feasibility of a security measure less noticeable to the jury.
*959 In discussing the long-standing distinction between the use of physical restraints and other less inherently prejudicial ways of monitoring a defendant's courtroom conduct, the Marks court cited the observation in Duran, supra, 16 Cal.3d at page 291, footnote 8, that the presence of armed guards in the courtroom need not be justified by the court or the prosecutor unless they are present in unreasonable numbers. The opinion in Marks states that "[t]he Duran holding encompassed not only the standard positioning of officers but also their unusual deployment, as is shown by its citation to People v. David (1939) 12 Cal.2d 639, 644 [86 P.2d 811], where a deputy drew up his chair immediately behind where the defendant was sitting." (Marks, supra, 31 Cal.4th at p. 223.)
The relevant facts of People v. David are simple and warrant description, as they differ markedly from the case before us. The defendant in that case was convicted of first degree murder without mitigating or extenuating circumstances and sentenced to death. At the commencement of trial, and in the presence of a panel of prospective jurors, "as the defendant took his seat inside the rail one of the deputy sheriff's drew up a chair immediately behind him. Counsel for the defendant moved to discharge the panel upon the ground that the conduct of the deputy sheriff had created prejudice in the minds of the prospective jurors. The court requested the deputy to move back to the rail and denied the defendant's motion." (People v. David, supra, 12 Cal.2d at p. 644.) Unsurprisingly, the Supreme Court concluded that the deputy's conduct did not prejudice the defendant in any way. (Ibid.) Unlike the present case, the extraordinarily brutal nature of the crime charged in People v. David and the defendant's claim of insanity clearly suggested the need for added security precautions. Furthermore, the security measure imposeda guard seated behind the defendant as he sat at the defense tablewas considerably less prejudicial to the defendant than that challenged in this case. Finally, the court diminished any risk of prejudice by directing the deputy to move away from the defendant and also by giving the jury a cautionary instruction.
The Duran footnote discussed in Marks also cited Kennedy v. Cardwell, supra, 487 F.2d 101, which was quoted by the United States Supreme Court in Holbrook, supra, 475 U.S. at page 569, for its statement that courtroom security might in certain circumstances "`create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'" Kennedy was referring to "guards seated around or next to the defendant during a jury trial," and noted that the likelihood of such positioning creating the above impression was one of the reasons for a defendant's "right to be tried in an atmosphere free of partiality created by the use of excessive guards except where special circumstances, which in the discretion of the trial judge, dictate added security precautions." (Kennedy v. Cardwell, at p. 108.) The Sixth Circuit went on to explain, "Also the placement of guards in relation to the defendant could materially interfere with his ability to consult with counsel. *960 However, the use of guards for security purposes, when wisely employed, provides the best means for protecting a defendant's fair trial right and only in rare cases would greater security precautions be warranted. Since guards can be strategically placed in the courtroom when more than normal security is needed and can be hidden in plainclothes, the jury never needs to be aware of the added protection so that no prejudice would adhere to the defendant." (Id. at pp. 108-109, fn. omitted, italics added.)
The security measure taken in the present case was not "wisely employed," as by having the deputy sheriff "strategically placed in the courtroom" so that the jury would be unaware of him. Moreover, and more significantly, there are here no "special circumstances" dictating the need for added security precautions in the first place.[6]
In addition to the absence of need for and likely prejudicial effect of the deployment of the armed guard, the present case differs from Marks in the lack of guidance jurors were given about how to interpret the guard's placement. As we have noted, the trial court in Marks instructed the jurors not to speculate as to the reasons for the officer's position during the defendant's testimony or let it affect their deliberations or conclusions, and not to draw any adverse inferences from this "perfectly normal procedure." Here, because the trial court refused defense counsel's request for a cautionary instruction, jurors were free to draw whatever conclusions they wished from the fact that appellant was closely monitored throughout trial by an armed deputy sheriff who escorted him to and from the stand and remained behind him while he testified.
*961 In short, the analyses in Marks, supra, 31 Cal.4th 197 and Duran, supra, 16 Cal.3d 282, and the case law they rely upon, stand only for the proposition that, as stated by the Supreme Court in Holbrook, supra, 475 U.S. at page 569, the presence and deployment of armed guards in the courtroom does not necessarily deprive a defendant of the due process right to a fair trial, and the determination whether it does must be made on a case-by-case basis. Marks simply does not, as the dissent suggests, hold that the stationing of a single bailiff "near" an in-custody defendant is never an abuse of discretion. (Dis. opn., post, at p. 971.)[7]
(6) Our task is to determine whether, in the circumstances of this case, the "challenged security measures are so inherently prejudicial as to deny the defendant the constitutional right to a fair trial" by presenting "an `unacceptable risk' that impermissible factors will come into play." (People v. Hayes (1999) 21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645], quoting Holbrook, supra, 475 U.S. at p. 570.) Although the trial court "has broad power to maintain courtroom security and orderly proceedings" (People v. Hayes, at p. 1269), where the security measures used, in the specific *962 circumstances of the case, are inherently prejudicial and not sufficiently justified, it necessarily follows that the court has abused its discretion.[8]
As we have stated, the trial court here viewed the placement of the bailiff during appellant's testimony as an exercise of its discretion. But the court expressly stated that this procedure was used in every case: "I've seen it happen in every trial I've ever done and that is because of security. And the defendant, as all defendants, even in a petty theft, if they sit there, a bailiff is supposed to sit behind them for security of the jury, for security of everyone. [¶] ... [¶] ... It's just what happens in every case that I've ever tried. [¶] ... [¶] ... I think he deserves what every defendant deserves, and that is security for himself and for all the rest of us."
(7) The fact that in every criminal case in which she presided the trial judge had an armed guard escort the defendant to and from the witness stand and remain with the defendant throughout his or her testimony, without regard to whether there had been a showing of any need for such a procedure, demonstrates that "discretion" was exercised, if at all, in a vacuum, without any balancing of the need for security against the defendant's right to a fair trial. "`"The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]"' (Westside Community for Independent Living, Inc. v. Obledo (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365], citing to 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 244.) The scope of discretion always resides in the particular law being applied, i.e., in the `legal principles governing the subject of [the] action ....' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an `abuse' of discretion. (See Hurtado [v. Statewide Home Loan Co. (1985)] 167 *963 Cal.App.3d [1019,] 1022 [213 Cal.Rptr. 712].) If the trial court is mistaken about the scope of its discretion, the mistaken position may be `reasonable', i.e., one as to which reasonable judges could differ. (See, e.g., the majority and dissenting opinions in Baggett v. Gates [(1982)] 32 Cal.3d 128 [185 Cal.Rptr. 232, 649 P.2d 874].) But if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law." (City of Sacramento v. Drew (1989) 207 Cal.App.3d 1287, 1297-1298 [255 Cal.Rptr. 704]; accord, People v. Jacobs (2007) 156 Cal.App.4th 728, 737 [67 Cal.Rptr.3d 615].) (8) Here, because the particular security measure at issue carried a grave risk of prejudice by singling appellant out as potentially dangerous or untrustworthy, the court could not exercise its discretion rationally without considering the actual need for the measure.
The routine procedure of placing an armed deputy sheriff closely behind a defendant when he or she takes the stand to testify is rational only upon the assumptions that (1) all criminal defendants are potentially violent or disruptive and present a risk to courtroom security, (2) the risk is always sufficient to warrant the routine procedure, and (3) the routine procedure never infringes a defendant's due process right to a fair trial and therefore need not be modified in order to accommodate that right. The first two assumptions are so irrational as to go beyond the legal pale, and the third is outside the legal boundaries that constrain discretion. The trial judge's indulgence of these assumptions constituted a dereliction of her preeminent judicial responsibility to insure that trials are conducted as fairly and impartially as the circumstances permit.
The fact that the trial court felt it unnecessary to even inquire whether appellant posed any danger to courtroom security, the absence of any showing appellant presented such a danger, and the likelihood that the challenged procedure prejudiced appellant in the jurors' eyes, compel us to conclude, as we do, that the court abused its discretion.[9]
(9) The abuse of discretion was exacerbated by the trial court's puzzling refusal to give a cautionary instruction that might have diminished the possibility that the jury would infer from the deployment of the armed guard that appellant was dangerous and untrustworthy. As we have described, defense counsel asked the court to modify the jury instruction required to be given when a defendant appears in physical restraintswhich directs jurors *964 to disregard the restraints and not consider them for any purposeto direct the jurors not to consider the fact that appellant was "in custody." The court refused on the ground that there was no reason for the jury to believe appellant was in custody, since he was wearing plain clothes and the jury had never seen him "go in and out of any door." Yet, as defense counsel correctly pointed out, the very fact that an armed guard sat behind appellant in the well of the courtroom, escorted him to and from the witness stand, and remained behind him there while he testified, could not more clearly have communicated the fact that appellant was in custody. Arguably, the request should have been for an instruction more like the one given in Marks. (See, ante, at p. 956, fn. 4.) But the refusal to give any instruction addressing the position of the armed guard left the jury free to draw any inferences it wished from appellant's treatment, including the obvious inference that he was dangerous and therefore likely guilty of the charged offense. When a defendant is required to appear at trial in visible restraints, the court has a duty to instruct the jury sua sponte "that such restraints should have no bearing on the determination of the defendant's guilt." (Duran, supra, 16 Cal.3d at pp. 291-292.) When the circumstances of a case are such that the use of guards in the courtroom creates "`an unacceptable risk ... of impermissible factors coming into play'" (Holbrook, supra, 475 U.S. at p. 570), the rule should be the same.
Having found that the trial court abused its discretion, the remaining question is whether the error is sufficiently prejudicial to require reversal.
(10) Where a court requires physical restraints without adequate justification, reversal is required unless the People can prove beyond a reasonable doubt that the error did not contribute to the verdict. (Deck, supra, 544 U.S. at p. 635.) Courtroom security measures that rise to the level of inherent prejudice violate the same principles and require the same standard of review.
As appellant urges, the jury's determination of whether to convict or acquit depended heavily on jurors' assessments of appellant's and Belarde's respective credibility. Both suffered from chronic alcoholism, both had difficulty remembering details of the incident, and both had given inconsistent statements about it. To name but a few examples, Belarde gave different accounts of the amount of alcohol she had consumed to the police, to the defense investigator, and at trial. She told the defense investigator appellant had told her to stop "pulling on" him and accused her of attempting to steal money from him, but at trial said appellant had not done this. Belarde stated early in her testimony that she shoved appellant twice, but on cross-examination denied having done so. She told the paramedic at the scene that she had been hit by a man who was trying to rob her, but did not mention anything about an attempted robbery to the police or in describing the incident at trial. Appellant, for his part, acknowledged having falsely told the police Belarde *965 had tried to stab him, trying to explain this at trial as having been "the alcohol talking," and told the police he first met Belarde on the night of the incident, then testified that he meant only that he did not know her well.
The 911 tape did not conclusively support either Belarde's or appellant's version of the events: The caller's report that the man he saw had the woman in an "arm lock" and "threw her all to the ground," and the fact he did not mention a stick, was consistent with appellant's description of the events, while the caller's statement that the man was "hitting" and "slapping" the woman and was "hitting her with all his strength" was more consistent with Belarde's description. The caller did not see the entire incident; he was in a car driving past and said the woman was "on the ground when we saw them." The caller was therefore unable to shed light on whether the altercation was initiated by an assault on appellant, as he claimed. Neither the descriptions of Belarde's injuries nor the photographs of them were conclusive as to how they were inflicted, that is, whether they resulted from hitting the ground on her face or from being beaten as she described. Appellant attempted to explain his flight from the scene and his bleeding knuckles; the credibility of his explanation was part of what the jury was required to consider.
In this situation, where appellant's credibility was a major factor in the trial, the deck was severely stacked against him. Unlike any other witness, appellant was escorted to and from the witness stand by an armed law enforcement officer who remained to guard him during his testimony, and who stood or sat immediately behind him when he was not testifying. The court told the jury nothing about how to interpret this close monitoring and so it was free to draw the obvious inferences that the court viewed him as potentially dangerous and he was therefore likely to have committed the charged assault. Indeed, the prejudice from the procedure could have affected jurors entirely without their awareness. (See Holbrook, supra, 475 U.S. at p. 570 ["Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused."].)[10]
Respondent suggests that any error with respect to placement of the deputy cannot be deemed prejudicial because the jury's verdict was supported by *966 appellant's own testimony. Appellant testified that after Belarde continued to come at him, he was "pretty pissed" and "just slammed her, threw her," saw her "land on her face, and I didn't mean to do that." It is true that appellant never suggested any other person was responsible for Belarde's injuries, and readily acknowledged that he had acted in anger, but he testified that his intent was only to get Belarde off him, not to injure her. Immediately before the testimony respondent quotes, appellant had described trying to keep Belarde away as she "came at [him] just wild, screaming"; Belarde broke free of the headlock he had gotten her into and "came at me again swinging wildly and then yelling all kinds of stuff ...." Appellant testified that he lost his temper and threw her on the ground, but said he "didn't know I threw her that hard, but she landed on her face" and he had "no intent to do bodily harm. [¶] ... [¶] I just wanted to get away from her." Appellant's theory of defense, as portrayed in the jury instructions on self-defense[11] and his attorney's argument as well as in his testimony, was that he was acting to protect himself from Belarde. The jury was instructed that the prosecution had the burden of proving beyond a reasonable doubt that appellant did not act in lawful self-defense or used more force than was reasonably necessary to protect his property. Defense counsel argued the prosecution had not proven it was unreasonable to "push off a drunk woman who is hitting at him who is asking him for money who started to become aggressive" and "shove her to the ground." Especially in light of both Belarde's and appellant's lack of sobriety at the time of the incident, which could have affected both of their abilities to perceive the events at the time and to remember them later, the evidence was not so clear cut that we can say, to the certainty of the beyond a reasonable doubt standard, that the jury would have rejected appellant's defense had it not been subjected to the "`impermissible factors'" (Holbrook, supra, 475 U.S. at p. 570) introduced by the procedure under which appellant was forced to testify.

II.
One additional issue requires our attention, as it would be relevant in the event of a retrial. Appellant contends that the trial court failed to instruct the *967 jury that the great bodily injury enhancement had to be proved beyond a reasonable doubt. Appellant urges that the instructions only informed the jury that the prosecution was required to prove appellant "guilty" of the "charges." Since the verdict forms directed the jury to find appellant "not guilty" or "guilty" of the "crime," but to find the "enhancement" to be "not true" or "true," appellant maintains the jury would not necessarily have known that it was required to apply the beyond a reasonable doubt standard in making its findings on the enhancement.
At the beginning of jury selection, the court informed the prospective jurors that appellant was charged with "assault by both deadly weapon and force likely to produce great bodily injury" and that it was "further alleged pursuant to Penal Code Section 12022.7[, subdivision] (a) that in the commission, an attempted commission of the above offense, that the defendant personally inflicted great bodily injury upon" Belarde. Before opening statements, in instructing the jury about the "ground rules" for the trial, the court instructed that the presumption of innocence "requires that the People prove each element of a crime and special allegation beyond a reasonable doubt." Among the instructions given before the jurors retired to deliberate, the court instructed, pursuant to CALCRIM No. 220, that the presumption of innocence "requires that the People prove the defendant guilty beyond a reasonable doubt. Whenever I tell you that the People must prove something, I mean they must prove it beyond a reasonable doubt." After defining "beyond a reasonable doubt," the court instructed the jury, "[i]n deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial" and find the defendant not guilty "[u]nless the evidence proves the defendant's guilt beyond a reasonable doubt." The court was not requested to, and did not, give CALCRIM No. 3160, which defines "great bodily injury" and instructs that if the jury finds the defendant guilty of the charged or lesser crimes, it must then decide whether the People have proved, beyond a reasonable doubt, the "additional allegation that the defendant personally inflicted great bodily injury" upon the victim.
(11) Contrary to respondent's argument that appellant waived this claim of error by failing to object to the instructions as given, the court had a duty to give this instruction sua sponte. "A trial court `must instruct even without request on the general principles of law relevant to and governing the case. [Citation.] That obligation includes instructions on all of the elements of a charged offense. [Citation.]' (People v. Cummings (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1].) `This rule applies to the "elements" of an "enhancement."' (People v. Winslow (1995) 40 Cal.App.4th 680, 688 [46 Cal.Rptr.2d 901], fn. omitted.)" (People v. Clark (1997) 55 Cal.App.4th 709, 714-715 [64 Cal.Rptr.2d 193].) It follows that the rule also applies to the fundamental requirement that each element of an enhancement that increases *968 the penalty beyond the prescribed maximum be proved beyond a reasonable doubt. (See People v. Sengpadychith (2001) 26 Cal.4th 316, 326 [109 Cal.Rptr.2d 851, 27 P.3d 739].)
(12) Respondent argues that the court fully instructed the jury on the burden of proof with respect to both the charges and the enhancement, and, to the extent the instructions were deficient or ambiguous, there was no reasonable likelihood the jurors would have failed to understand the enhancement had to be proven beyond a reasonable doubt. (Estelle v. McGuire (1991) 502 U.S. 62, 72-73 & fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475] [question with ambiguous instruction is "`whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution"].)
Respondent correctly points out that the court instructed the jury, at the beginning of the trial, that the prosecution was required to prove "each element of a crime and special allegation beyond a reasonable doubt." This instruction, however, was given at the outset of the trial, before the jury heard two and a half days of testimony. It was not among the written instructions provided to the jury, which stated that the prosecution was required to "prove a defendant guilty beyond a reasonable doubt." The fact that the verdict forms used different language with respect to the charged offenses and enhancement"guilty" and "not guilty," as in the beyond a reasonable doubt instruction, for the offenses, but "true" or "not true" for the special allegationcould have been misunderstood by jurors to mean that it was required to apply the beyond a reasonable doubt standard only to the questions pertaining to appellant's "guilt." Since the predeliberation instructions and written instructions supplied to the jury only addressed the need for the prosecution to prove appellant "guilty" beyond a reasonable doubt, without mentioning that the same requirement applied to the enhancement allegations, the possibility of jurors misunderstanding this point was enhanced. We need not determine here the likelihood that appellant was prejudiced by the absence of a predeliberation jury instruction that the enhancement had to be proven beyond a reasonable doubt, only to reiterate that the trial court had a duty to give such an instruction, and to do so in the same manner that it gives all other instructions, so that its significance is not diminished.

DISPOSITION
The judgment is reversed.
Being moot, the petition for writ of habeas corpus is denied.
Richman, J., concurred.
*969 HAERLE, J., Dissenting.
While I concur with several points made by the majority, I respectfully disagree with its ultimate holding, because I believe that holding ignores the legal significanceor rather the lack thereofof the criticisms the majority makes of the trial court's rulings regarding the presence of a uniformed and armed bailiff near appellant in the course of the trial.
First of all, I agree with the majority's criticism of the trial court's refusal to admonish the jury that they should not draw any adverse inferences from stationing of the bailiff near defendant when he was sitting at the defense table and when he was on the witness stand. (See maj. opn., ante, at pp. 963-965.) Such an instruction was provided, and quite properly I think, in a case the majority cites, People v. Marks (2003) 31 Cal.4th 197, 223 [2 Cal.Rptr.3d 252, 72 P.3d 1222] (Marks). But nowhere in that opinion did our Supreme Court stateor even hint for that matterthat such an instruction is required under those or similar circumstances. And the majority cites no authority holding that such an instruction is required under those circumstances.
Secondly, I agree with the majority's criticism[1] of the trial court's failure to make clear, on the record, that it was making a discretionary "call" and citing the bases for its exercise of discretion. But, and apparently unlike the majority, I think the trial court's ruling is, at the very least, ambivalent regarding whether it was in fact exercising its discretion. Suggesting that it was doing so are its several references to the facts that this defendant was charged with "a 245 with a very bad injury," and had "an 18-page rap sheet" including "burglary and restraining order violations, which means inability to follow the orders of the court." Finally, this seems to be confirmed by the trial judge's express statement that she was making a "discretionary call." On the other side of the coin are her comments that she followed this procedure in "every trial I've ever done," "even in ... petty theft" trials. Hence my conclusion that the trial court was ambivalent on the issue of whether or not it was exercising its discretion.
But, and per a case decided by this court, any such ambivalence must be interpreted in favor of the conclusion that the trial court did indeed exercise its discretion. In People v. Tang (1997) 54 Cal.App.4th 669 [62 Cal.Rptr.2d 876] (Tang), we affirmed the trial court's sentence of a defendant who had pled guilty to voluntary manslaughter. On appeal, that defendant challenged the sentence imposed, arguing that certain facts in the record, especially the fact that the sentencing report before the trial court perhaps contained some errors, demonstrated that it had not, in fact, exercised its discretion regarding *970 the sentence imposed. We rejected this argument in these words, words I submit are equally applicable here: "While courts' sentencing discretion is constitutionally mandated and therefore jealously guarded, a trial court's failure to exercise such discretion must be demonstrated in the same manner as any other error. `We must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate errorit will not be presumed. [Citation.]' [Citations.]" (Id. at p. 677; see also People v. Mosley (1997) 53 Cal.App.4th 489, 496 [62 Cal.Rptr.2d 268].) Notably, the majority cites no decisions contrary to Tang's statement of the law.[2]
However, my principal reason for dissenting is that I believe the majority's extended attempt to distinguish over a dozen appellate precedents,[3] including particularly the holdings of our Supreme Court in Marks and the United States Supreme Court in Holbrook v. Flynn (1986) 475 U.S. 560, 568-569 [89 L.Ed.2d 525, 106 S.Ct. 1340] (Holbrook), fails completely. It does so, I submit, principally because the majority neither fully quotes nor follows the statement of the applicable law found in Marks.
That statement is encompassed in two paragraphs of Marks; those paragraphs read: "Defendant cites [People v.] Duran [(1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322]] for the proposition that there must be a `manifest need' for the placement of the marshal so close to him as he testified. Duran imposed the manifest need standard for the use of physical restraints. [Citation.] Duran expressly distinguished such shackling from monitoring by security personnel. `We are not here concerned with the use of armed guards in the courtroom. Unless they are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor.' (Duran, at p. 291, fn. 8.) The Duran holding encompassed not only the standard positioning of officers but also their unusual deployment, as is shown by its citation to People v. David (1939) 12 Cal.2d 639, 644 [86 P.2d 811], where a deputy drew up his chair immediately behind where the defendant was sitting. [Citation.] The distinction between shackling and monitoring is long-standing. The David court distinguished that case's deployment of security personnel with the physical restraints that caused prejudice in People v. Harrington (1871) 42 Cal. 165. [Citation.] Harrington *971 was the primary authority on which Duran relied, and its reasoning indicates that courtroom monitoring by security personnel does not necessarily create the prejudice created by shackling. `"[A]ny ... physical burdens, pains and restraints upon a prisoner during the progress of his trial, inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional rights of defense; and especially would such physical bonds and restraints in like manner materially impair and prejudicially affect his statutory privilege of becoming a competent witness and testifying in his own behalf."' [Citation.] The United States Supreme Court has likewise refused to find the `conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial [as] the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest ....' [Citing Holbrook.] Holbrook observed, `While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, ... it is entirely possible that jurors will not infer anything at all from the presence of the guards .... Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.' [Citation.] [¶] We therefore maintain this distinction between shackling and the deployment of security personnel, and decline to impose the manifest need standard for the deployment of marshals inside the courtroom. (Duran, supra, 16 Cal.3d at p. 291, fn. 8.)" (Marks, supra, 31 Cal.4th at pp. 223-224, italics omitted.)
We are, as the majority acknowledges,[4] not dealing at all with the "shackling" issue here. Nor, to quote Marks, are we dealing with "`unreasonable numbers'" of bailiffs or with any other "`numbers or weaponry [that might] suggest particular official concern or alarm.'" (Marks, supra, 31 Cal.4th at pp. 223-224.) We are dealing, rather, with the stationing of one bailiff near defendantexactly the same situation as in Marks.
I respectfully submit that the foregoing two paragraphs from Marksa unanimous decision of our Supreme Court issued just six years agomean, shortly and simply, that the stationing of a single bailiff near an in-custody defendant, particularly one on trial for a violent crime (both of which factors were present here), is not now and never has been an abuse of discretion. Indeed, nowhere in its 32-page opinion does the majority cite any decision so holding.
*972 Holbrook was also a unanimous decision, one in which the United States Supreme Court, in a decision written by Justice Thurgood Marshall, reversed a decision of the court of appeals for the First Circuit which had, in turn, reversed a federal district court's denial of a habeas corpus petition attacking a Rhode Island state court conviction. There, as the majority notes, the trial court permitted the seating of four uniformed state troopers "in the first row of the spectators' section" of the courtroom during the trial of six in-custody defendants accused of breaking into safe deposit boxes and escaping with several million dollars. (Holbrook, supra, 475 U.S. at pp. 562, 565.) The court found this action not "inherently prejudicial," in the process distinguishing cases involving the shackling or binding of a defendant. It held that "`reason, principle, and common human experience,' [citation] counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." (Id. at p. 569.)
I submit that, contrary to Holbrook and the long line of federal cases following it,[5] the majority's holding here is effectively based on precisely the sort of "presumption" unanimously rejected by the Holbrook court.
In any event, the holdings of our Supreme Court in Marks, Duran and David and the United States Supreme Court in Holbrook make clear, I submit, that the governing legal principle applicable in a case such as this is: it is not an abuse of discretion for a trial court to station a bailiff or deputy sheriff behind or near an in-custody defendant charged with a violent crime whether that defendant is sitting at the defense table or on the witness stand.[6] And despite the extended efforts of the majority to distinguish Marks, Duran, David, Holbrook, and many other federal and state appellate cases (see maj. opn., ante, at pp. 955-966), it cites no authority at all holding to the contrary of that principle. Nor (as noted above) does it cite any casefederal or statefinding prejudice in the stationing of a bailiff near an in-custody defendant in the courtroom.
*973 Although, for the reasons stated at the beginning of this opinion, I agree with the majority that the bailiff-stationing issue could have been handled better by the trial court, I respectfully submit that abundant legal precedent precludes our reversing this judgment.
NOTES
[1] All statutory references will be to the Penal Code unless otherwise specified.
[2] Specifically, Belarde's medical records reflected hospitalizations in April 2004 and May 2004 for tremors and seizures due to alcohol withdrawal, a hospitalization in August 2006 for treatment of infected skin lesions reported to be spider bites she received "while passed out on a park bench while intoxicated," and for alcoholic withdrawal and a seizure suffered while sitting on a bench at the county jail in January 2005.
[3] CALCRIM No. 204 provides: "The fact that physical restraints have been placed on [the] defendant[s] is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations."
[4] The court read the following admonition, at the defense's request: "`With respect to the position of Deputy Scott, you'll observe that Deputy Scott is seated up next to the jury box. [¶] First of all, let me indicate to you that you are not to speculate as to the reasons why Deputy Scott is in this position, nor are you to let it become part of your deliberations or your conclusions in this case in any way. This is a perfectly normal procedure, and you should not draw any adverse [inferences] from this of any kind.'" (Marks, supra, 31 Cal.4th at p. 223.)
[5] The dissent suggests that the Marks trial court's instruction to the jury, referring to the stationing of the bailiff by the defendant while he testified as a "`"perfectly normal procedure,"'" indicates that the trial court in the present case was "not alone in using such a procedure." (Dis. opn., post, at p. 970, fn. 2, quoting Marks, supra, 31 Cal.4th at p. 223.) Nothing in Marks supports this suggestion. As we have said, the trial court in Marks deployed the bailiff after an individualized determination that the security measure was required by the circumstances in that case. It seems patent that its jury instruction, which was requested by defense counsel, was designed solely to mitigate the prejudice the court recognized to be presented by this unusual security measure, not to offer a general observation that the procedure was routine or "normal" in all cases.
[6] In addition to People v. David, supra, 12 Cal.2d 639 and Kennedy v. Cardwell, supra, 487 F.2d 101, the Duran footnote cites three other cases for the proposition that the mere presence in the courtroom of a reasonable number of armed guards does not need to be justified: People v. Harris (1950) 98 Cal.App.2d 662, 664-665 [220 P.2d 812], U.S. v. Henderson (5th Cir. 1973) 472 F.2d 556, 557, and Dennis v. Dees (E.D.La. 1968) 278 F.Supp. 354. In People v. Harris, a defendant previously convicted of numerous violent crimes was charged with possession of a dagger in San Quentin, where he was serving time for murder. An unspecified number of San Quentin prison guards called as witnesses were present in the courtroom and the defendant asked that they all be excluded from the courtroom when not testifying. The trial court granted the request but allowed one armed guard, other than the one testifying, to remain "in the courtroom," and this was found a "reasonable" precaution. (Harris, at p. 664.) Dennis v. Dees granted a petition for writ of habeas corpus to a defendant who had been forced to stand trial for the murder of a fellow prison inmate in prison garb and shackles, with armed guards at the courtroom entrance and outside the building, with no evidence the defendant was an escape risk or difficult to handle. (Dennis v. Dees, supra, 278 F.Supp. at pp. 357-359.) U.S. v. Henderson involved an unsuccessful challenge to the shackling and forced wearing of prison garb by a demonstrably violent defendant charged with murdering a fellow prison inmate. (U.S. v. Henderson, supra, 472 F.2d at p. 557.) U.S. v. Henderson disapproved Dennis v. Dees to the extent the latter conflicted with its analysis regarding prison garb. (472 F.2d at p. 557.)
[7] Respondent points to two cases from other jurisdictions which upheld security procedures similar to those challenged here: U.S. v. Williams (8th Cir. 1990) 897 F.2d 1430 and People v. Peeples (2002) 205 Ill.2d 480 [275 Ill.Dec. 870, 793 N.E.2d 641]. We find neither persuasive.

In U.S. v. Williams, a federal marshal stood next to the defendant and near a door while he testified. The court's entire analysis is as follows: "Decisions regarding security needs in the courtroom are squarely within the discretion of the trial court. United States v. Gambina, 564 F.2d 22, 24 (8th Cir. 1977). Further, the burden of affirmatively demonstrating prejudice from security measures is on the defendant. United States v. Robinson, 645 F.2d 616, 617 (8th Cir. 1981). Where the marshal was standing and whether he was in uniform are disputed, but these issues are irrelevant. Even if the marshal was in uniform and standing next to Williams, the district court, in ruling on the defendant's motion for mistrial, found no prejudice. Our review of the record and Williams' arguments have not convinced us that this ruling was in error." (U.S. v. Williams, supra, 897 F.2d at p. 1434.) This analysis utterly fails to consider the effect of the deployment of the marshal on the jury and the extent to which it may have prejudiced the defendant's right to a fair trial.
In People v. Peeples, two deputies sat behind the defendant at the defense table, then one of them escorted the defendant to the witness stand and stood behind him during his testimony. (People v. Peeples, supra, 793 N.E.2d at p. 669.) Peeples rejected the defendant's argument that this procedure was "`inherently prejudicial'" because "the Supreme Court in Holbrook rejected a presumption that `any use of identifiable security guards in the courtroom is inherently prejudicial' and held that `[i]n view of the variety of ways in which such guards can be deployed, ... a case-by-case approach is more appropriate.' [Citation.]" (People v. Peeples, at p. 671, quoting Holbrook, supra, 475 U.S. at p. 569.) It then went on to reject the alternative claim that, even if not prejudicial per se, the security procedure employed did prejudice the defendant by creating an unavoidable inference that he was dangerous and guilty, citing cases which upheld "similar measures" and Holbrook's observation that "a juror may reasonably draw a wide range of inferences from the presence of security personnel in the courtroom." (People v. Peeples, at pp. 671-672.) In our view, Peeples's analysis overlooks the distinction drawn in Holbrook between general security measures in the courtroom and procedures that single out the defendant and suggest official concern specific to him or her.
[8] People v. Hayes stated that "the use of security personnel, even in the courtroom, is not so inherently prejudicial that it must be justified by a state interest specific to the trial," elaborating this point by quoting from Holbrook on the wider range of inferences to be drawn from the use of security officers in the courtroom than from the use of physical restraints. (People v. Hayes, supra, 21 Cal.4th at p. 1268.) The quotation makes clear while individualized justification is not required when the procedure employed is a general security measure that does not unmistakably indicate "`the need to separate a defendant from the community at large,'" the situation is different when the security force suggests "`particular official concern or alarm'" posed by the defendant. (Ibid., quoting Holbrook, supra, 475 U.S. at p. 569.) Similarly, Duran distinguished use of security personnel from physical restraints, noting that "[u]nless they are present in unreasonable numbers, [armed guards in the courtroom] need not be justified by the court or the prosecutor." (Duran, supra, 16 Cal.3d at p. 291, fn. 8.) Although Duran referred only to "unreasonable numbers" of guards, it is doubtful that this brief comment, which simply noted that the court's discussion of manifestly prejudicial physical restraints did not encompass the distinct issue of armed guards in the courtroom, was intended to apply to every other potential use of security guards, no matter how unreasonable.
[9] Resting on the proposition that a trial court's exercise of discretion must be demonstrated and will not be presumed, for which he cites People v. Tang (1997) 54 Cal.App.4th 669, 677 [62 Cal.Rptr.2d 876], our dissenting colleague concludes that the trial court's "ambivalence" as to "whether or not it was exercising its discretion ... [¶] ... must be interpreted in favor of the conclusion that the trial court did indeed exercise its discretion." (Dis. opn., post, at p. 969.) This conclusion erroneously assumes that the trial court had discretion to dispense with the individualized inquiry compelled by law.
[10] Appellant argues he was further prejudiced in the jurors' eyes by the prosecutor's attempt to impeach him with a nonexistent felony arrest for soliciting prostitution. During cross-examination, over defense objection, the prosecutor asked appellant about having been arrested for felony prostitution. Appellant denied ever having been arrested for prostitution. Subsequently, in chambers, defense counsel informed the court that the arrest at issue was noted on the rap sheet as "647(F), felony prostitution," but in fact section 647, subdivision (f), is public drunkenness. The court denied defense counsel's motion for a mistrial and request for a jury instruction on prosecutorial misconduct, viewing the incident as accidental, and directed counsel to prepare a "very strong curative instruction." It subsequently informed the jury, "It was incorrect when [the prosecutor] had indicated to the jury that the defendant had been arrested for felony prostitution. That was incorrect. He, in fact, had not ever been arrested for prostitution, felony or misdemeanor. So you are to disregard that and act as if you've never heard it."
[11] The jury was instructed that appellant was not guilty of the charged assault if he "reasonably believed that he or someone else was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully," "reasonably believed that the immediate use of force was necessary to defend against that danger," and "used no more force than was reasonably necessary to defend against that danger." (CALCRIM No. 3470.) In addition to instructions elaborating on those three requirements, the jury was instructed that the "owner or possessor of personal property may use reasonable force to protect the property from imminent harm." (CALCRIM No. 3476.)
[1] Regarding that criticism, I believe some of the majority's language (e.g., "so irrational as to go beyond the legal pale" and "dereliction of her preeminent judicial responsibility") (maj. opn., ante, at p. 963) is unnecessarily harsh.
[2] Our Supreme Court's Marks opinion quotes the instruction given in that case by a very experienced Alameda County Superior Court judge that the stationing of a bailiff "`next to the jury box'" when that defendant was testifying "`is a perfectly normal procedure'" (Marks, supra, 31 Cal.4th at p. 223). This language suggests that this trial court is not alone in using such a procedure.
[3] See majority opinion, ante, at pages 953-962.
[4] Curiously, the majority devotes several pages of its opinion to cases involving defendants required to wear prison clothing and/or being shackled in some way. (Maj. opn., ante, at pp. 954-955.) As Marks makes clear, this is a totally different situation than that involved in both that case and here.
[5] Since Holbrook, apparently no federal court has held that the use of normal security guards in a courtroom has prejudiced a criminal defendant. (See Thirty-Sixth Annual Review of Criminal Procedure, Competency to Stand Trial (2007) 36 Geo. L.J. Ann.Rev.Crim.Proc. 1, 551, fn. 1716.)
[6] See also People v. Ainsworth (1988) 45 Cal.3d 984, 1003-1004 [248 Cal.Rptr. 568, 755 P.2d 1017]; People v. Miranda (1987) 44 Cal.3d 57, 114-115 [241 Cal.Rptr. 594, 744 P.2d 1127], disapproved in part on other grounds in People v. Marshall (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676]; and People v. Jenkins (2000) 22 Cal.4th 900, 997-999 [95 Cal.Rptr.2d 377, 997 P.2d 1044]. Even more cases to the same effectand with the same result, i.e., no error in the stationing of a bailiff in a courtroomare cited in 5 Witkin, California Criminal Law (3d ed. 2000) Criminal Trial, section 17, pages 61-62.